AMERICAN SURETY COMPANY, a corporation, and Frank W. Rohlik, Appellants,

v.

Frank SCHOTTENBAUER, Appellee.

No. 15952.

United States Court of Appeals
Eighth Circuit.

June 20, 1958.

O. C. Adamson, II, Minneapolis, Minn. (Arthur B. Geer and Meagher, Geer, Markham & Anderson, Minneapolis, Minn., were with him on the brief), for appellants.

Richard T. Malone, St. Paul, Minn., for appellee.

Before GARDNER, Chief Judge, and VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In his complaint, plaintiff-appellee (hereinafter referred to as plaintiff), stated three causes of action against defendants-appellants, American Surety Company and Frank W. Rohlik (hereinafter referred to as defendants), seeking to recover actual and punitive damages. The American Surety Company (sometimes referred to as Surety Company) was the workmen's compensation insurer for the Wabasso Coop Creamery Association, plaintiff's employer, and Rohlik was the local agent for the corporate appellant. Plaintiff's second cause of action, for libel, and his third cause of action, invasion of his right of privacy, were dismissed on motion at close of the evidence, leaving only the cause of action for wrongful interference with plaintiff's contract of employment, for submission to the jury. The jury returned a verdict for plaintiff for $8500, and upon his consent to the Court's order reducing the amount to $7,000, defendants' motion for new trial was denied. Defendants also interposed a motion for judgment which was overruled. Defendants have appealed, and contend that the verdict is not supported by the evidence, is contrary to law and their motion for judgment notwithstanding the verdict should have been sustained.

Because of the diversity of citizenship and involvement of more than the statutory amount, we have jurisdiction.

In determining the question for decision, we view the evidence in the light most favorable to plaintiff. National Alfalfa Dehydrating & Milling Co. v. Sorensen, 8 Cir., 220 F.2d 858, 862; Dealer's Transport Co. v. Werner Transp. Co., 8 Cir., 203 F.2d 549, 552; Railway Express Agency, Inc., v. Mackay, 8 Cir., 181 F.2d 257, 259, 19 A.L.R. 2d 1248. The litigation grew out of these facts: Plaintiff, age 37 at trial time, had lived in Wabasso, Minnesota, all of his life, and had worked continuously for the Wabasso Creamery from 1942 until April, 1956. He worked six days a week, ten hours a day, and an occasional Sunday for an average salary of $365 to $375 per month. He had a high school education, and had been trained for no other type of work. Plaintiff's duties included the making of butter and handling heavy cream cans, and he was required to make frequent trips in and out of a cooler. His hands came in contact with hot and cold water, various chemicals and other liquids. In June, 1955, plaintiff "bumped" the middle finger of his right hand, causing him pain. An open sore or ulcer developed on the finger for which he received treatment from his family physician, Dr. Alcorn, for a period of four or five months. In November, 1955, Dr. Alcorn concluded that plaintiff should undergo an examination at the Mayo Clinic. On December 1, 1955, Dr. Alcorn, by letter, reported to defendant Surety Company the results of his treatment, and on December 28, 1955, again reported to said company. In the latter report, the doctor stated that the "ulcer has healed and remained so in the past two or three weeks," and expressed the opinion the circulation disturbance should be classed as occupational and compensable.

On January 16, 1956, Mayo Clinic reported to the Surety Company, by letter, that plaintiff had been a patient at the clinic from November 23 through November 26, 1955. That institution diagnosed the appellant's condition as a "vasospastic disorder with manifestations primarily those of Raynaud's Phenomenon." From other medical evidence it appears that "Raynaud's Phenomenon" is a disease where there is a constriction or a spasm of the small blood vessels of the fingers, which shuts down the supply of the blood. Aside from major surgery, which produces variable results, Raynaud's Phenomenon is incurable, and can be aggravated by sudden temperature changes, trauma or nicotine. Mayo's report stated that it had suggested to plaintiff that it might be advisable for him to change the nature of his job to avoid repeated exposure to cold, the possibility of living in a region with a warm climate on a trial basis, and to discontinue the use of tobacco "because of the vasospastic characteristics of nicotine."

On March 19, 1956, plaintiff was examined by a Dr. Felder on behalf of the defendant Surety Company, and in a report to the company bearing the same date, Dr. Felder stated that since plaintiff's visit to Mayo Clinic in November, 1955, he has had a gradual improvement in his condition; that he had a healed scar on the distal end of right middle finger, and that, "I believe that at the present time he is recovering, but that he still should refrain from the use of tobacco and also should continue to stay away from any work which will repeatedly traumatize the right hand. He informs me that in his present job he is able to do this."

Prior to the examination by Dr. Felder, and on January 16, 1956, Donald L. Barclay, claim manager for the Surety Company, took the Mayo Clinic report to Dr. Orley W. Foster for interpretation. From Dr. Foster, Mr. Barclay learned that Raynaud's Phenomenon was the "contracting or the swelling and contracting of the vessels in the finger, * * *." Following his visit with Dr. Foster, Barclay contacted Mr. John R. Simacek, superintendent of casualty insurance for the Minneapolis Branch Office of the Surety Company, and informed Simacek of the nature of plaintiff's condition. "I told him (Simacek) Raynaud's Phenomenon was a disease in which the vessels in the finger and hand

would swell both inwardly and outwardly, causing the circulation to be cut off from the member, * * * the disease could not be cured in itself, * * *. I told him, because the circulation could be stopped when the disease is aggravated, that there was a possibility of amputation. I told him that the fingers could easily have this resulting condition and would have to be amputated, and that aggravation of such could even cause the amputation of the hand." Bearing upon the report made by Barclay to Simacek, it should be noted that Dr. Foster, after testifying at some length as to effect of the disease, stated: "If gangrene develops as a result of Raynaud's Phenomenon and amputation is necessary, then the involved area is the distal portion or just a part of the finger or fingers. *It never requires the amputation of a hand.* If Mr. Barclay stressed that thought, he misunderstood or did not understand the medical situation with exact accuracy." And on cross examination, the doctor stated: "It is only in advanced aggravated cases of Raynaud's Phenomenon that amputation becomes necessary. * * * Even in the most deteriorated condition, not more than one and one-half digits of a finger are ever amputated."

On March 27, 1956, Mr. Simacek wrote the following letter to defendant Rohlik, which is the basis for plaintiff's cause of action:

"We have been advised by our claim department that an employee of yours, Mr. Frank Schottenbauer, went through the Mayo Clinic after recent accident he had while in the employment of the above-captioned insured. The Mayo Clinic diagnosed his case as having Raynaud's Phenomenon, which is a very serious disease and must be taken very close care of. He also was viewed by our company's doctor, Dr. Felder. With this disease, it is felt that our company could obtain a very serious loss, which the insurance policy is not designed to cover. Therefore, it is our opinion that either this

company should immediately terminate this man's employment or else we do feel that we will have no alternative but to cancel the policy.

"Under this disease that Mr. Schottenbauer has, by exposure that the Mayo Clinic outlined to him, he would have the possibility of losing one or more of his fingers, or his entire hand, and I am sure you can appreciate that this is a very serious exposure.

"We sincerely regret having to take an action such as this, however, we do feel that we have no alternative and we would appreciate your immediate cooperation and your immediate comments."

Mr. Simacek testified that the statement in the letter to the effect that the disease might result in the loss of a finger or fingers or possibly a hand, was based upon his conference with Mr. Barclay, and the latter's interpretation of Dr. Foster's oral report; that the reports from Mayo Clinic, Dr. Alcorn and Dr. Felder were available when he wrote the letter, but he did not at any time contact either of said doctors or any other person who might have had actual knowledge of plaintiff's condition prior to the writing of the letter: "I can think of nothing except something that I sort of heard Dr. Foster had told someone else which would in any way tend to suggest the loss of a finger or hand by Mr. Schottenbauer. On that basis I went ahead and wrote the letter of March 27th."

Following receipt of the letter by Mr. Rohlik, he presented it to the officials of the creamery company; a conference was had with plaintiff in regards to the contents thereof, and plaintiff was discharged on April 14, 1956. While there may be room for some dispute as to whether plaintiff was discharged as the result of the letter, or voluntarily resigned, the evidence affords ample proof to support the jury's finding that his employment was terminated as the direct result of the letter. On this question, plaintiff testified that Mr. Berglin, man-

ager of the creamery, gave him no other reason for terminating his employment. "The sole reason he gave for terminating my job was the letter that Mr. Rohlik had brought in."

■ Wrongful interference with a contractual right is actionable in Minnesota, this cause of action being recognized in its various forms; e. g., inducing a breach of an existing contract for broker's fees, Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667; Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252; Spring Co. v. Holle, 248 Minn. 51, 78 N.W.2d 315, inducing a breach of sales and service contracts, leases, etc.; Twitchell v. Nelson, 131 Minn. 375, 155 N.W. 621 (giving damages prospectively); Mealey v. Bemidji Lumber Co., 118 Minn. 427, 136 N.W. 1090; and situations concerning "competitive" motives in inducing an abandonment of pre-existing contract, as noted in Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35; Canellos v. Zotalis, 145 Minn. 292, 177 N.W. 133. See also Annotation 84 A.L.R. 43 et seq., which deals with the subject of liability for procuring a breach of contract in a general way only; and Annotation 29 A.L.R. 532 et seq., which deals more specifically with interference with employment contracts; 86 C.J.S. Torts § 44; 30 Am.Jur., Interference, § 21.

The courts of Minnesota have ruled that the elements essential to recovery for tortious interference are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom, Snowden v. Sorensen, 246 Minn. 526, 75 N.W.2d 795, 799, and cases there cited.

Defendants concede the presence of the first two elements, but urgently insist that the evidence failed to establish: (A) Defendants' acts caused the termination of plaintiff's employment; (B) Defendants' acts were without justification (i. e., not privileged); and (C) Plaintiff suffered damages, resulting from defendants' acts.

■ Contention A must be ruled against defendants. As already observed, although there was some dispute as to whether plaintiff voluntarily resigned or was discharged because of the letter, the conclusion is inescapable that there was sufficient probative evidence to support the jury's finding that the letter brought about the discharge.

Several reasons are advanced to support contention B. It is argued that since the employment contract between plaintiff and his employer was terminable at will, and plaintiff would have had no right of action against Wabasso Creamery for termination of his employment, plaintiff has no standing to complain of the conduct of defendants, particularly when viewed in light of the relation between the parties.

■ Regarding the liability of a third person for procuring a breach of contract on the part of another, the general rule is that it is immaterial that the contract is terminable at will. 30 Am. Jur., Interference, § 26; Annotation 84 A.L.R. 43, 60 through 62; Truax v. Raich, 239 U.S. 33, loc. cit. 38, 36 S.Ct. 7, loc. cit. 9, 60 L.Ed. 131, where it is stated: "The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will." (Citing cases.) Professor Prosser, while recognizing some authority to the contrary exists, states that the overwhelming majority of the cases have held that interference with employment or other contracts terminable at will is actionable, "since until it is terminated the contract is a subsisting relation, of value to the plaintiff, and presumably to continue in effect." Prosser on Torts, Second Edition, Ch. 23, § 106, p. 726. Minnesota holds with the majority rule. See Miller v. Monsen, 228 Minn. 400, 37 N.W.2d 543, holding that a child has a right of action against

one who interferes to the extent of enticing the mother away from the home, thus interfering with the child's *reasonable expectancy of benefits* flowing from the relation to its mother; and more to the point, Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 205 N.W. 630, rehearing denied, 206 N.W. 396; Joyce v. Great Northern Ry. Co., 100 Minn. 225, 110 N.W. 975, 8 L.R.A.,N.S., 756 (both holding interference with *anticipated* opportunities for employment actionable); and Bacon v. St. Paul Union Stockyards Co., 161 Minn. 522, 201 N.W. 326, dealing with employment contract terminable at will.

Defendants' principal argument in support of contention B is grounded in the relation existing between the Surety Company and the Wabasso Creamery. More precisely, it is asserted that because of the subsisting contract between those parties (the workmen's compensation insurance policy), the Surety Company could have been exposed to an abnormal risk if plaintiff, suffering from Raynaud's Phenomenon, had been retained as an employee of the creamery. It is said that this situation vested the Surety Company with such an interest in the business of plaintiff's employer, that it was justified, as a matter of law, in interfering as it did, even to the extent of causing plaintiff's discharge.

It is universally recognized that interference in contractual relations may, in a proper case, be justified.[1] But there is a conflict among the authorities as to whether interference may be justified where the defendant acts for the sole purpose of furthering his own financial or economic interests. In Prosser on Torts, Second Edition, Ch. 23, § 106, p. 737, this pronouncement appears:

"If he has a present, existing economic interest to protect, such as the ownership or condition of

property, or a prior contract of his own, *or a financial interest in the affairs of the person persuaded,* he is privileged to prevent performance of the contract of another which threatens it; * * *." (Emphasis supplied.)

86 C.J.S. Torts § 44, p. 967 states the general rule in this language:

"One who has a financial interest in the business of another possesses a privilege to interfere with the contract between the other and someone else if his purpose is to protect his own interests *and if he does not employ improper means,* * * *." (Emphasis supplied.)

■ See also Annotation 84 A.L.R. pp. 83–85, where cases from many states dealing with justification to further own financial interest of defendant are collated. Citing 84 A.L.R. 83, and 26 A.L.R. 2d 1265, 30 Am.Jur., Interference, § 35 states the rule to be: "It is not justification for knowingly procuring the breach of a contract that the defendant acted without an improper purpose and sought only to further his own interest." Minnesota follows this principle of law, see Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252, 255 (involving improper interference with real estate broker's contract); Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 756, 84 A.L.R. 35 (interference with automobile dealer's contract); Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667 (interference with contract to purchase real estate); cf. also Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 205 N.W. 630, 632, rehearing denied, 206 N.W. 396, action to recover damages for preventing plaintiff from securing employment. Thus it will be seen that when the Supreme Court of Minnesota had occasion to apply the rule that it is not justification to knowingly procure the

[1] See Wolfson v. Northern States Management Co., 210 Minn. 504, 299 N.W. 676, 678; Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 205 N.W. 630, 632, 206 N.W. 396; Bacon v. St. Paul Union Stockyards Co., 161 Minn. 522, 201 N.W. 326, 327; Annotation 84 A.L.R. 43, 79–82; 30 Am.Jur., Interference § 34; 86 C.J.S. Torts § 44, pp. 966–969, Prosser on Torts, 2d Ed., Ch. 23, § 106, pp. 720–745.

breach of a contract where the defendant acted only to further his own interest, even though, without an improper motive, the court was dealing with factual situations different from those here presented. The Carnes case, supra, does throw some light on the course that court would pursue if called upon to determine whether the conduct of the defendants herein would constitute justification, as a matter of law. In Carnes, the court, with approval, cited United States Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A. L.R. 520, where plaintiff obtained a judgment for $25,000 for the wilful, malicious and wrongful procurement of his discharge by defendant. The facts in Millonas bear striking resemblance in some aspects, in that, as here, plaintiff's discharge was brought about by the act of the insurance company, which insured plaintiff's employer against certain claims. There, as here, the company threatened to cancel the policy if plaintiff was not discharged. But in Millonas, defendant was prompted to act as it did in order to force plaintiff to make a settlement of his claim to the advantage of defendant. The contention was made that, inasmuch as defendant had the absolute right to cancel the policy, it could not be held liable on a threat to do what it had the legal right to accomplish. In resolving this contention against the defendant the court stated 89 So. at page 735:

"In the instant case, the right of the defendant to cancel the contract of insurance with plaintiff's employer was of course not questioned, and if his discharge had been but the result or consequence of such an exercise of a lawful right, no cause of action would be shown. Such, however, was not the case, as the evidence for the plaintiff tends to show that his discharge was procured maliciously and wrongfully by a threat of cancellation, for the purpose of forcing a settlement of his claim favorable to the company and disadvantageous to himself. Plaintiff complains therefore, not of the consequence of the exercise of a lawful right, but of the unlawful use of that lawful right by the defendant."

While the defendant may, under certain circumstances be justified, as a matter of law, in interfering with the employment contract of a third party, we have concluded that under the facts of this case, and as we reconcile the Minnesota law on the subject, the issue of justification was one for the jury to resolve. This conclusion is compelled by these aspects of the case: 1. Although defendant Surety Company concededly had the unqualified right to cancel the insurance policy at any time, the question remained as to whether the means it employed (fire plaintiff or we cancel) were proper and fully justified. 2. There was no factual basis for the statement, in the letter to Rohlik, that plaintiff "would have the possibility of losing one or more of his fingers, or his entire hand, and I am sure you can appreciate that this is a very serious exposure." 3. There was meagre evidence to sustain the statement in the letter that "our company could obtain a very serious loss," because plaintiff had Raynaud's Phenomenon. The fact of the matter is, the Surety Company knew that plaintiff's middle finger had been healed for some time when the letter was written. The evidence revealed that his condition had responded satisfactorily to the treatment prescribed; he was performing his duties without difficulty and apparently to the complete satisfaction of his employer. 4. Although defendant Rohlik testified that the Wabasso Creamery could have obtained workmen's compensation insurance from another source without additional cost, this information was not imparted to plaintiff's employer until after plaintiff had been discharged.

We observe that the Minnesota Supreme Court has adhered to the view that the plea of justification is ordinarily one for the jury. In the Carnes case, supra, 205 N.W. 630, at 632, it is

said: " * * * in general the issue (justification) is largely one of fact for the jury; *the standard being reasonable conduct under all the circumstances * * *.*" (Emphasis supplied.) In Royal Realty Co. v. Levin, supra, 69 N. W.2d 667, at page 673, the court stated: "We need not here concern ourselves with what constitutes sufficient justification. The term is not susceptible of any precise definition, and normally it is a question of fact for the jury's determination." And finally in Wolfson v. Northern States Management Co., 210 Minn. 504, 299 N.W. 676, it is said at page 678: "It (the question) was whether, in terminating the agreement, whatever its nature, defendants acted with justification and in good faith. That issue was largely one of fact for the jury, the standard being reasonable conduct under all of the circumstances in the case."

It is of some significance that this case has twice been tried in the United States District Court (this appeal being from the second trial), and not only did plaintiff prevail in each instance, but in both cases the defendants' motion for judgment was denied.

■ Defendants' final contention is, "plaintiff has failed to prove the damages awarded to him." If thereby defendants are contending that their motion for judgment should have been sustained because of a total failure to prove *any* damages, the point cannot be sustained. We have heretofore demonstrated that there was evidence justifying the finding by the jury that plaintiff was discharged because of defendants' interference and without justification. And we have seen that at the time plaintiff was separated from his employment, he was earning $365 to $375 monthly; that he was without employment from April 15, 1956, to October 1 of same year, he incurred expense in moving to the state of California in the approximate amount of $500, and living costs in California are greater than in the state where plaintiff formerly resided. In this situa-

tion, a jury issue was presented on the damage question.

We are inclined to view the assignment, particularly in light of its development in written argument, as a claim of excessiveness. So considered, the contention must fail. This court has consistently adhered to the principle that the alleged excessiveness of a verdict in a tort case will not be reviewed but is a question to be determined by the trial court. In St. Louis Southwestern Ry. Co. v. Ferguson, 8 Cir., 182 F.2d 949, where the claim was advanced that the verdict was so grossly excessive as evidently to have been the result of sympathy, passion and prejudice, we reconsidered the question at length and demonstrated that the foregoing rule has been recognized and adhered to generally in other circuits, and accords with the pronouncements by the Supreme Court on the subject, loc. cit. 954 and 955. See also Agnew v. Cox, 8 Cir., 254 F.2d 263, 267, where this Court, speaking through Judge Gardner, again reiterated the principle, stating in part:

"Confessedly the question of the alleged excessiveness of a verdict cannot be raised by motion for a directed verdict but may only be raised by motion for new trial and we have invariably held that a motion for new trial is addressed to the sound discretion of the trial court. In Zimmerman v. Mathews Trucking Corp., supra [8 Cir., 203 F.2d 864], we had occasion to consider the question of the alleged excessiveness of the verdict and in the course of the opinion we stated the controlling rule as follows:

" 'This Court has consistently adhered to the proposition that the responsibility for keeping jury awards within reasonable bounds is essentially that of the trial courts and not of this Court.'

"In National Alfalfa Dehydrating & Mill. Co. v. Sorensen, supra, [203 F.2d 868] adhering to the prior decisions of this court and the controlling rule with reference to the

**14**

right to review the question of the alleged excessiveness of a verdict in a tort case, we said:

" 'Defendant's first contention is that the verdict is excessive. The short answer to this contention is that in Federal courts in tort cases the question of the alleged excessiveness of the verdict is not reviewable on appeal. See Glendenning Motorways v. Anderson, 8 Cir., 213 F.2d 432, and cases there cited. What the rule may be in state courts we need not consider as this is a procedural matter.' "

While we consider the jury was liberal in allowing plaintiff $8500, the question of excessiveness was for the trial court to consider. This was in fact done, as evidenced by the action of the Court in reducing the award to $7000. Even this amount, in our opinion, constitutes a substantial allowance, but we are not at liberty to interfere.

Accordingly, the judgment is affirmed.