349 F.2d 975
 William SMITH, doing business as Smith Entertainment Agency
and as Smith & Dale Circus, Appellant,
v.
AMERICAN GUILD OF VARIETY ARTISTS, Appellee.
AMERICAN GUILD OF VARIETY ARTISTS, Appellant,
v.
William SMITH, doing business as Smith Entertaimnent Agency
and as Smith& Dale Circus, Appellee.
 Nos. 17856, 17857.
 United States Court of Appeals Eighth Circuit.
 Aug. 9, 1965, Rehearing Denied Sept. 9, 1965.
 
 Conrad J. Carr, Minneapolis, Minn., Jerome G. Raidt, Minneapolis, Minn., for William Smith, doing business as Smith Entertainment Agency and as Smith & Dale Circus.
 Leo Dorfman, of Dorfman, Rudquist, Jones & Ramstead, Minneapolis, Minn., for American Guild of Variety Artists.
 Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal by plaintiff William Smith from an order of Judge Larson sustaining the motion of defendant American Guild of Variety Artists (AGVA) for judgment n.o.v. setting aside a jury verdict for the plaintiff and from final judgment dismissing plaintiff's complaint. Plaintiff is also appealing from the trial court's refusal to submit to the jury for consideration an action based upon secondary boycott and from the refusal of the trial court to submit to the jury his claim for punitive damages.
 
 
 2
 AGVA by cross-appeal raises the issue that the trial court erred in conditionally denying defendant's alternate motion for a new trial based upon the ground that there is no substantial evidence to support the fact of damage or the amount thereof and upon the additional ground that the court's interrogation of certain witnesses was improper and prejudicial.
 
 
 3
 This case had been previously tried to a jury with Judge Devitt presiding. The jury returned a verdict for the plaintiff for $15,000. Judge Devitt granted defendant's motion for a new trial upon the ground the verdict was excessive, stating that in his view the evidence would not support a verdict for more than $3,000. This case was again tried to a jury before Judge Larson. The jury returned a verdict of $21,500.
 
 
 4
 Plaintiff's complaint sets out two causes of action. The first cause of action is based upon failure to arbitrate. Both Judge Devitt and Judge Larson dismissed this cause of action. No appeal is taken on the failure to arbitrate issue and hence no consideration thereof is required.
 
 
 5
 In the second cause, plaintiff seeks damages based upon (1) violations of 29 U.S.C.A. 158(b)(4)(ii) by secondary boycott; (2) wrongful interference with contractual relations.
 
 
 6
 A summary of some of the background facts appears desirable. William Smith had produced grandstand shows and circuses for fairs and celebrations since 1956. He had contracts with numerous union performers and had executed contracts with seventeen fairs for the presentation of a grandstand show or circus during the 1962 season.
 
 
 7
 Smith had obtained contracts for a number of performances in Canada and Alaska for the spring of 1962. Under his contract with AGVA he agreed to hire only union acts and to cover wages and transportation with security posted with the defendant and to make certain welfare contributions to defendant for the performers. He failed to comply with the security and welfare provisions with respect to the Canadian trip and he also failed to fulfill his obligation to pay the performers the full salaries due them. There is much controversy in the record as to what occurred in Canada. Smith contends that some of the performers attempted to take the show away from him. Plaintiff did leave the performers in Canada in the middle of the tour. The show continued its tour under the management of some of the employees.
 
 
 8
 Plaintiff had contracts to produce a show advertised as a twenty-act circus at seventeen fairs in the midwest during the summer of 1962. Many of the performers on the Canadian tour were under contract to plaintiff to play at such fairs. The fair run was to commence at the fair at Faribault, Minnesota, on July 28, 1962, with an afternoon and evening show on that date and an evening show the following day. On July 17, prior to the first performance at Faribault, a meeting of the defendant organization was held at Minneapolis to consider complaints made by plaintiff's performers arising out of the Canadian tour. As a result thereof, plaintiff was put on the unfair list for nonpayment of salaries due and was notified of such action by telegram, and notice thereof was also given to the seventeen fairs with whom plaintiff held contracts.
 
 
 9
 Herbert Meyers, AGVA manager of defendant's Minneapolis branch, contacted the Faribault Fair Board by telephone and later had a personal meeting with the Board. Board members testified that Meyers told them that even if plaintiff wanted to produce a non-union show, he could not do so because the defendant would not permit it and they also said that the AGVA was going to take over the contract. The Fair Board was advised that plaintiff would not be permitted to put on the show and that the fair would be picketed. The Board was also urged to cancel plaintiff's contract and to enter into a contract for the shows with the defendant. The Board refused to cancel the contract.
 
 
 10
 AGVA put up a picket line at the grandstand on the afternoon of July 26. The pickets were placed so that customers wishing to purchase grandstand tickets had to cross the picket line. Plaintiff's circus was not scheduled to, and in fact did not, perform until Saturday afternoon, July 28. The picketing continued on Thursday and on all day Friday and Saturday, and on part of Sunday. An automobile thrill show on Thursday night and a wrestling show on Friday night, with which plaintiff had no connection, were picketed.
 
 
 11
 Plaintiff assembled non-union acts for the Faribault engagement. After the Saturday afternoon performance, the Fair Board canceled plaintiff's contract for the remaining shows on the stated ground that the number and quality of the acts did not conform to the contract. Within a short time thereafter, plaintiff's sixteen other fair contracts were canceled. Additional facts will be set out in the course of the opinion.
 
 
 12
 'THE SECONDARY BOYCOTT ISSUE'
 
 
 13
 Judge Larson, upon defendant's motion made at the close of all of the evidence, dismissed plaintiff's cause of action based on secondary boycott. In explanation of such action, the court states:
 
 
 14
 'To summarize the basis for this decision: The dispute between plaintiff and defendant was a labor dispute within the meaning of 29 U.S.C.A. 152(9); the strike had the objective of placing direct economic pressure on the primary employer, Smith, in order to resolve the dispute arising from his breach of the collective bargaining agreement. Such a strike in support of lawful demands is permissible.
 
 
 15
 'The common situs situations present the most difficult problems of distinguishing between primary and secondary activity. The instant activity was not directed at the Fair Board but at the primary employer. The manner of picketing met the standards for lawful primary activity set out in Matter of Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547, given the rather unusual business involved in the instant case.
 
 
 16
 'Plaintiff argued that defendant 'threatened, coerced or restrained' certain persons. The picketing was primary and did not become illegal secondary activity even if threats were involved. United Steelworkers of America (AFL-CIO) v. N.L.R.B., 376 U.S. 492 (84 S.Ct. 899, 11 L.Ed.2d 863) (1964).'
 
 
 17
 We agree with Judge Larson's view that Smith's failure to comply with his contract with AGVA with respect to paying wages due employees, welfare payments and the posting of security, afforded AGVA a right to place Smith on the unfair list and to strike in support of its lawful demands. However, we do not consider the evidence here to be so great as to warrant a determination by the court as a matter of law that the strike conducted was a primary strike directed only at the employer Smith. 29 U.S.C.A. 158(b)(4)(ii) makes it an unfair labor practice for a labor organization or its agents:
 
 
 18
 '(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--* * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the respresentative of such employees under the provisions of section 159 of this title: PROVIDED, that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.'
 
 
 19
 The statutory proviso clearly protects primary picketing. The problem presented is whether the court was justified in determining as a matter of law that the strike was a primary strike.
 
 
 20
 The picketing took place on the Fair's premises. We believe this to be a common situs situation where a neutral employer is engaged along with a struck employer in different activities on the same premises. In NLRB v. International Hod Carriers, 8 Cir., 285 F.2d 397, 400-401, after quoting from NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, we stated:
 
 
 21
 'To resolve the numerous problems which stem from common situs activities, and in order to protect the Union's right to carry on its lawful activities against the primary employer, as well as to adequately protect the neutral employers and employees, strangers to the dispute, certain evidentiary standards were evolved for distinguishing between primary and secondary picketing at a common situs. These may be stated as the 'Moore Dry Dock tests,' Sailors' Union of the Pacific, AFL and Moore Dry Dock Company, 92 N.L.R.B. 547. Under the situation presented in that case, the Board ruled that picketing the premises of a secondary employer is primary if it meets the following conditions:
 
 
 22
 "a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; b) at the time of the picketing the primary employer is engaged in its normal business at the situs; c) the picketing is limited to places reasonably close to the location of the situs; and d) the picketing discloses clearly that the dispute is with the primary employer."
 
 
 23
 The evidence before us does not meet the Moore Dry Dock tests set out in the foregoing quotation, particularly (b) which relates to the primary employer at the time being engaged in his normal business activity at the situs. As heretofore set out, the picketing at the grandstand commenced two days before plaintiff's scheduled performance was given and continued after defendant became aware that plaintiff's contract had been canceled. Such picketing interfered with the Thursday and Friday grandstand shows with which plaintiff had no connection whatsoever and the picketing also interfered with grandstand concessions.
 
 
 24
 Moreover, prior to the opening of the fair, defendant made repeated demands that plaintiff's contract be canceled and that a show sponsored by defendant be substituted. When such efforts failed, Meyer stated 'this leaves me no alternative but to picket the fair.' The picket signs read, 'Do Not Patronize CIRCUS at this FAIR.' The words 'at this' were much smaller than the other words making the sign appear to read 'do not patronize Circus Fair.'
 
 
 25
 If as we have held the picketing does not fall in the category of lawful primary picketing, a violation of 158 (b)(4)(B) is established by proof that an objective of the strike is to compel a neutral employer to cease doing business with the struck employer. In considering the 'an object test' in Local 618, etc. v. NLRB, 8 Cir., 249 F.2d 332, 334, we said:
 
 
 26
 'The 'an object' test, applied here by the Board, is recognized as a proper test in cases where the picketing involved was no lawful primary picketing. National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299. The Court holds that it is not necessary to find that the sole object of the strike was that of inducing a neutral employer to cease doing business with another person.'
 
 
 27
 We conclude that there is an evidentiary basis in our present case for a jury finding that a common situs situation is here presented, that the strike is not a lawful primary strike and that an objective of the strike was to compel the Fair Board to cease doing business with the plaintiff. The court erred in directing a verdict on the secondary boycott issue and in failing to submit such issue to the jury. Such error requires a reversal.
 
 
 28
 UNLAWFUL INTERFERENCE WITH CONTRACTUAL RELATIONS ISSUE.
 
 
 29
 Minnesota courts, as well as courts generally, have long recognized the existence of a common law action based upon tortious interference with contractual relations.
 
 
 30
 'The courts hold with substantial unanimity that the wrongful and malicious interference by a stranger with existing contract relations between others, which causes one of the parties to breach the contract, is a tort, and that the injured party may recover damages therefor.' Carnes v. St. Paul Union Stockyards Co., 164 Minn. 457, 205 N.W. 630, 631.
 
 
 31
 See American Surety Co. v. Schottenbauer, 8 Cir., 257 F.2d 6; Continental Research, Inc. v. Cruttenden, Podesta & Miller, D.Minn., 222 F.Supp. 190; Wolfson v. Northern States Management Co., 210 Minn. 504, 299 N.W. 676. See generally 86 C.J.S. Torts, 44; 30 Am.Jur. Interference, 18-32; annot. 26 A.L.R.2d 1227. But if the interference is justifiable or privileged, there is no liability. See Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667; Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35. The Minnesota court has commented upon justification: "To justify an act of interference of this sort it must be founded upon some lawful object." Sorenson v. Chevrolet Motor Co., supra at 755. The malice required by the Minnesota court has been defined as follows:
 
 
 32
 'The term 'malice,' as used in the class of cases mentioned, means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right. Whether a wrongdoer's motive in interfering is to benefit himself, or to gratify his spite by working mischief to another, is immaterial; malice in the sense of ill will or spite not being essential.' Carnes v. St. Paul Stockyards Co., 205 N.W. 630, 631-632. "'Interference with Contract Relations,' includes not merely the procurement of a breach of contract, but all invasion of contract relations, so that any act injuring or destroying persons or property which retards, makes more difficult or prevents performance, or makes performance of a contract of less value to the promisee, may fall within its scope, it may be said that the interest in a contract being a property right, a party thereto has a right of action against persons who are by their conduct substantially interfering with the performance thereof." Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252, 254.
 
 
 33
 The trial court, after it had submitted the contractual interference issue to the jury and a verdict in favor of the plaintiff had been returned, sustained the defendant's motion for judgment n.o.v. The trial Court, citing 1 Harper and James, The Law of Torts, 6.13, recognizes that contractual relations are interfered with deliberately and intentionally in a strike and that a prima facie tort is thus made out. The court bases its decision on the premise that where the action causing the contractual interference is protected by a labor statute, the rights of labor under such statute must be protected and that hence the issue in such type of case is whether the labor statutes afford justification for the action complained of. We agree that a right to strike falling within the protection of national labor statutes would afford a defense of justification or privilege to a contractual interference action. The court states:
 
 
 34
 'The crux of the instant case is to what extent the actions of the defendant have exceeded its privilege, and it is on this point that plaintiff has failed to establish a case. As indicated above, the picketing was for lawful objectives, and it was carried on in a lawful manner. The test of economic strength contemplated by our industrial relations system as a means of resolving conflicts between employers and unions may well result in one of the parties being brought to his knees although mutual self-interest and relative strength militates against such a result in the vast majority of cases. Yet this was the result in the instant case. The defendant's picketing resulted in plaintiff's inability to perform his contract. In furthering its own interests defendant harmed the plaintiff, but its conduct was privileged because carried out within the context of a legitimate labor dispute.'
 
 
 35
 Plaintiff raises the issue that the court erred in placing the burden upon him on the privilege issue. The first sentence of the excerpt just quoted lends support to plaintiff's claim that such burden was placed upon him. In Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W.2d 667, 673, the Minnesota court recognized 'that the burden of proving sufficient justification for the interference rests on the defendants.' This view is in accord with the general interpretation. See Annot. 26 A.L.R.2d 1227, 1263-1264. Thus it appears that the burden of proof on justification is on the defendant. From a reading of the court's opinion as a whole, we doubt whether the court's decision turned upon the burden of proof issue and we would hesitate to reverse on this ground alone.
 
 
 36
 Plaintiff's basic contention is that the court erred in determining upon the record before us that justification existed as a matter of law for defendant's picketing of the scope here involved. In American Surety Co. v. Schottenbauer, supra, this court in considering a Minnesota contractual interference case determined that Minnesota has adhered to the view that the plea of justification is ordinarily one for the jury.
 
 
 37
 Congress has by the Taft-Hartley Act granted labor certain rights but it has also defined and proscribed certain unfair labor practices. Union conduct which would constitute an unfair labor practice is not privileged. In the preceding division, we have expressed our view that a fact issue is presented on the secondary boycott issue. A violation of the secondary boycott provision is an unfair labor practice. Judge Devitt, who presided at the first trial submitted the secondary boycott issue to the jury and in overruling a motion for judgment n.o.v. stated:
 
 
 38
 'A second ground supporting the motion for judgment n.o.v. is that the plaintiff failed to sustain the burden of proof that he was damaged by reason of any unfair labor practice under 8(b)(4). Section 303(b) specifically requires that the action complained of be the proximate cause of the alleged injury. The evidence on this point was sparse. It is not unlikely that the contract termination was largely the result of plaintiff's inability to perform the contract. But the jury's verdict is entitled to great weight, and the party in whose favor the veridct was returned is entitled to all favorable inferences that can be reasonably drawn from the evidence.'
 
 
 39
 The evidence on such issue was at least as strong at the second trial.
 
 
 40
 Additionally, we note that 8(b)(1) of the Taft-Hartley Act, 29 U.S.C.A. 158(b) (1) provides:
 
 
 41
 'It shall be an unfair labor practice for a labor organization or its agents--(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: * * *'
 
 
 42
 Section 7 of the Act (29 U.S.C.A. 157) provides:
 
 
 43
 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.'
 
 
 44
 The effect of Section 8(B)(1) was described by the chief sponsor of the Act, Senator Taft, in this manner:
 
 
 45
 "The effect of the pending amendment is that the Board may call the union before them, exactly as it has called the employer, and say, 'Here are the rules of the game. You must cease and desist from coercing and restraining the employees who want to work from going to work and earning the money which they are entitled to earn.' The Board may say, 'You can persuade them (that is, the employees not the public); you can put up signs; you can conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.' As I see it, that is the effect of the amendment." Capital Service, Inc. v. NLRB, 9 Cir., 204 F.2d 848, 853.
 
 
 46
 See United Automobile, etc., Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 272, 76 S.Ct. 794, 100 L.Ed. 1162. The Supreme Court has consistently recognized that Section 8(b)(1) was not the exclusive method of controlling threats, coercion and violence against employees by labor unions. See United Automobile, etc. Workers of America v. Wisconsin Employment Relations Board, supra; United Const. Workers, etc., v. Laburnum Contr. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025.
 
 
 47
 The evidence here would support a finding that the union's activities went well beyond peaceful primary picketing. There is substantial evidence of threats of physical harm made by Meyers and other pickets to non-union employees and fair officials which placed them in fear for their safety. When Smith's union employees went on strike, he employed non-union actors to put on the show. There is substantial evidence from which the jury could find that the defendant threatened and coerced such non-union actors with the result that some refused to perform and the performance of others was impaired. An inference could be drawn that the substandard performance could be attributed to threats made by the pickets. Moreover, the Secretary of the fair testified that Meyers told him the dog man was pretty mad and that 'he would hate to be in my shoes because I might not be living tomorrow.'
 
 
 48
 The Fair Board found it to be necessary to arrange for additional police protection. It is true that the Fair Board in canceling the contract assigned the reason that the performance did not conform to the contract. The threats made could well be found by the jury to be an important factor in the termination of Smith's contract. Picketing beyond lawful primary picketing could also have played a part in inducing the Fair Board to cancel the contract. The jury could have found that AGVA's actions proximately caused plaintiff's damage. It is not necessary that such action be the sole or primary cause of the damage but only that it be a substantial cause. See Haverhill Gazette Co. v. Union Leader Corp., 1 Cir., 333 F.2d 798, 805-06; E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc., 9 Cir., 252 F.2d 473, 479; Restatement, Torts 431.
 
 
 49
 Plaintiff presented evidence that the inferior performance and difficulty at Faribault caused cancellation of the sixteen favorable contracts he had with other fairs. The damage issue submitted to the jury relates to the profits at Faribault and the sixteen other fairs. Judge Larson in his opinion states:
 
 
 50
 'It there was liability for defendant's actions in Faribault, we fail to see how the liability could end there. Several contracts were cancelled at Faribault by other fair boards because of what occurred there; moreover, plaintiff could reasonably expect that had he attempted to perform at other fairs similar things would have happened since he would remain on the 'unfair list."
 
 
 51
 Plaintiff made a prima facie case of contractual interference. We believe the issue of whether defendant's conduct was justified or privileged was one of fact for the jury's determination. The court erred in determining as a matter of law that the defendant's conduct was privileged and in granting judgment n.o.v.
 
 
 52
 PUNITIVE DAMAGES.
 
 
 53
 Plaintiff urges the court erred in refusing to submit his claim for punitive damages to the jury. The court stated 'there is no sufficient evidence as to any claim for punitive damages.' Both Judge Devitt and Judge Larson refused to submit the punitive damage issue. Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280, holds that damages caused by secondary activities proscribed by 303 are limited to actual compensatory damages. There is also an indication that with respect to peaceful secondary activities, federal law has preempted the field and that state law must yield to federal limitations. There is evidence here that the threats and conduct went beyond lawful peaceful primary picketing. However, the privilege or justification defense appears to turn largely on federal labor law. Plaintiff has pointed out no Minnesota cases holding punitive damages are allowable in actions of this type. We are disposed to accept the considered view of the two experienced Minnesota federal judges who heard this case to the effect that no punitive damages are allowable.
 
 
 54
 CROSS-APPEAL.
 
 
 55
 Defendant has appealed from the trial court's order conditionally denying its motion for a new trial. Defendant's principal contention is that the evidence is insufficient to establish the fact of damage or the amount thereof. The court in ruling on the motion stated that the defendant was wrong in its contention that plaintiff's business was newly established. The court further observed that plaintiff had been profitably showing at fairs since 1957 and that it was reasonable to anticipate he would realize some profits from the seventeen fair contracts he held. The court also points out that a great deal more evidence was produced on lost profits at the second trial than at the first trial. Judge Devitt determined that the evidence at the first trial would support some damages but granted a new trial on the basis the damages allowed were excessive. The record here supports the court's determination that the evidence was adequate to establish the fact of damages. For a discussion of applicable standards on the damage issue, see McCleneghan v. Union Stock Yards Co., 8 Cir., 349 F.2d 53 (July 21, 1965). The court did not abuse its discretion in refusing a new trial.
 
 
 56
 Excessiveness of verdict is a matter basically for determination by the trial court and this court will interfere only in those rare situations where there is plain injustice or a monstrous or shocking result. Lowery v. Clouse, 8 Cir., 348 F.2d 252 (July 16, 1965); Solomon Dehydrating Co. v. Guyton, 8 Cir., 294 F.2d 439, 446-48.
 
 
 57
 We have examined defendant's contention that the trial courts independent interrogation of two witnesses on the question of anticipated profits was erroneous and prejudicial and find it to be without merit.
 
 
 58
 SUMMARY.
 
 
 59
 On plaintiff's appeal, we hold that the court erred in entering judgment n.o.v. for defendant. The court also erred in withdrawing from the jury plaintiff's cause of action based on secondary boycott.
 
 
 60
 The case was fairly submitted to the jury by proper instructions on the contractual interference cause of action. Such a cause of action is recognized and enforced under Minnesota law. The instructions adequately advised the jury that the defendant had a right to place plaintiff on the unfair list and to conduct a primary strike. The issue of privilege and justification was fully covered. Two juries have determined that the plaintiff is entitled to recover.
 
 
 61
 Plaintiff claims the same damages on the secondary boycott and contractual interference causes of action. Plaintiff is entitled to but one recovery for the same wrong. Thus in view of the favorable verdict on the contractual interference cause of action, plaintiff has suffered no prejudice by the court's failure to submit the secondary boycott cause of action.
 
 
 62
 Upon plaintiff's appeal, we reverse. We affirm on defendant's cross-appeal. This case is remanded to the trial court with directions to vacate its order of dismissal based on the sustaining of defendant's motion for judgment n.o.v. The trial court is directed to reinstate the verdict and enter judgment accordingly.