390 F.Supp. 678 (1974)
Marvin L. HARBER, Plaintiff,
v.
The OHIO NATIONAL LIFE INSURANCE COMPANY, a corporation, Defendant.
No. 71 C 715(3).
United States District Court, E. D. Missouri, E. D.
July 12, 1974.
*679 Paul H. Schramm and M. Harvey Pines, St. Louis, Mo., for plaintiff.
John P. Emde and Larry B. Luber, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for a decision on the merits following the trial to the Court sitting without a jury.
Plaintiff, Marvin Harber, brought this three count action against the defendant, The Ohio National Life Insurance Company. Plaintiff alleges that the defendant interfered with contractual or business relations and breached the contract involved herein.
The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law:

Findings of Fact
1) Plaintiff, Marvin Harber, resides in the Eastern District of the State of Missouri.
2) Defendant, The Ohio National Life Insurance Company, an Ohio corporation, has its principal place of business in the State of Ohio and is doing business in the State of Missouri.
3) Plaintiff, Marvin Harber, was employed by New York Life Insurance Company as an independent contractor beginning in May of 1958 and continuing to September of 1969. His activities consisted of working in the business of the estate planning market and in the sale of personal insurance in the black community of St. Louis and St. Louis County.
4) On November 27, 1968, Harber wrote Mr. Gerard R. Behnen of General American Life Insurance Company in St. Louis, indicating that he was interested in terminating his employment with New York Life because of "restrictions of the NYLIC Contract and my own outside business interests." Mr. Behnen referred Harber to Mr. Richard Strauss (also of General American), who discussed with Harber the possibility of becoming a General Agent for General American. General American was interested in the employement of Harber, save for the fact that Mr. Harber lacked "management experience," which would be preferable for a General Agent. General American advised Harber that he should consider employment with them for a year in a training program in order to gain the necessary experience, after which he could convert to the status of a General Agent. Mr. Harber declined this suggestion, because of the financial limitations involved and thereafter contacted Ohio National Life in response to a Wall Street Journal advertisement.
5) Harber and Ohio National entered into negotiations which led to Harber coming under contract as a General Agent as of August 16, 1969. During the negotiations, it was clear to Ohio *680 National Life that Harber had substantial personal business coming from negro clientele and that if contracted, such would continue. Further, it was clearly and expressly understood and anticipated that Harber would recruit Producing Agents, both Negro and Caucasian, to work in Harber's proposed agency.
6) After the August 16, 1969 contract date, a number of Supplements to the Basic Contract were entered into by the parties with the approval date of such Supplements being September 22, 1969. By the terms of the Supplements, Harber was to receive specified payments for such things as recruiting and development of agents, office expense, annualized commissions, etc.
7) Under the Contract in evidence, a General Agent is not an employee of the Company, but is rather an independent contractor, with such authority, duties and responsibilities as are stated in the Contract. Section V of the Contract provides the following:
"The General Agent shall observe and conform to such rules and regulations as the Company, from time to time, shall publish relating to its underwriting practices, the acceptance of risks, and the delivery of policies, or otherwise relating to the general conduct of business. Within the scope of his authority and subject to the applicable statutes and governmental regulations pertaining to the conduct of the business covered by this Contract, the General Agent shall be free to exercise independent judgment as to the persons solicited and the time, place and manner appropriate to the performance of his duties under this Contract. It is understood that the Company may make available, from time to time, training courses, sales methods and materials, prospect leads, office facilities or similar aids and services to the General Agent to assist him in the conduct of his business, but in no way shall such aids or services be construed as giving the Company control over the General Agent's time or the specific manner or means by which he conducts his business. In all respects, the relationship of the General Agent to the Company in the performance of all acts contemplated by this Contract shall be that of an independent contractor."
8) Producing Agents, likewise, are not employees of the defendant but are rather, independent contractors, with such authority, duties and responsibilities as are set forth in the Producing Agent's Contract. (Exhibit 10) Such Contract at Section V states the following:
"The Producing Agent shall observe and conform to such rules and regulations as the Company, from time to time, shall publish relating to its underwriting practices, the acceptance of risks, and the delivery of policies, or otherwise relating to the general conduct of business.
Within the scope of his authority, the Producing Agent shall be free to exercise independent judgment as to the persons, time, place and manner of solicitation. It is understood that the Company may make available, from time to time, training courses, sales methods and materials, prospect leads, office facilities or similar aids and services to the Producing Agent to assist him in the conduct of his business, but in no way shall such aids or services be construed as giving the Company control over the Producing Agent's time or the specific manner or means by which he conducts his business. In all respects, the relationship of the Producing Agent to the Company in the performance of all acts contemplated by this Contract shall be that of an independent contractor."
9) The General Agent's duties in relation to the Producing Agent are set forth in Section II of the Contract which provides the following:
"Recruiting, Training and Supervision. The General Agent shall recruit and recommend persons for appointment by the Company as agents within his agency and territory and shall properly train and supervise such *681 Agents in the performance of their duties."
In practice the Producing Agents, involved herein, work out of the office and under the supervision of the General Agent.
10) Plaintiff began operating under the General Agent's Contract in August of 1969; and, on January 1, 1970, Mr. Jack Nelson, a Negro who had been recruited by Harber as a Producing Agent, came under contract with the defendant. Shortly thereafter, a Caucasian named Patrick Heavey was recruited by Harber. However, Harber suggested to Heavey that he resign because Harber felt he lacked interest and was not using his best efforts to learn the life insurance business. Garfield Boon was the third Producing Agent recruited by plaintiff. On or about June 12, 1970, a Contract was entered into between defendant and Boon by which he was appointed a Producing Agent.
11) Defendant Ohio National Life Insurance Company places particular emphasis on the likelihood of "persistency" when considering an application for life insurance. The term "persistency" is a term of art used in the life insurance industry. "Persistency" is determined by computing that percentage of all issued and "paid for" policies which are continued in force by the policyholder by payment of additional premium through the thirteenth month after date of issue. "Persistency" by definition does not attempt to measure any renewals past the thirteenth month from date of issue.
12) Ohio National Life stresses "persistency" and has been successful over the years in obtaining very favorable results in this regard. Reports of the Life Insurance Agency Management Association for the years, 1970 and 1969, (defendant's Exhibits J and K respectively) indicate that Ohio National Life was first in its class of insurance companies in "persistency". In reviewing applications for acceptance or rejection, Ohio National considers such factors as the applicant's occupation, income, place of residence and social condition as indicative of the prospective degree of "persistency".
13) The Field Underwriters Manual (plaintiff's Exhibit 4), is a book supplied to all agents including Garfield Boon and contains a section on underwriting. On page C-6 of the Manual the defendant stated the following guidelines with regard to underwriting practices, lapse rates and persistency:
QUESTIONABLE CLASSES OF BUSINESS
Economic and social conditions and personal habits have a significant effect on both mortality and morbidity rates of life and health insurance among policyholders as well as on expense and lapse rates of policies.
General. Individuals and families living in slum neighborhoods, under congested and overcrowded conditions, in unhealthy and undesirable surroundings, with low or uncertain income, under circumstances where there is a high incidence of tuberculosis, influenza, pneumonia, syphilis, or other communicable disease, where infant and maternal mortality is high, in neighborhoods where homicide, accident, and crime rates are high, and in squalid home surroundings even in a desirable community, produce mortality and persistence results which do not meet our Company standards. Persons in these environmental situations should not be solicited. (Emphasis from the exhibit).
14) Boon solicited applications for life insurance, and in due course, the same were received by defendant at its home office in Cincinnati. In July of 1970, defendant's attention was called to the fact that some of the applications being submitted by Boon indicated business of a questionable quality, particularly in reference to anticipated persistency. Five "Inspection Reports" on applications solicited by Boon were exhibited by the defendant's Underwriting Department and such reports indicated that the proposed insureds were within the aforecited *682 Manual's "Questionable Classes of Business".
15) During a meeting at defendant's home office the "quality" of the applications submitted by Boon through the Harber agency was discussed. Thereat, it was decided that the business submitted by Boon was not the type desired by defendant. To implement this decision, restrictions were to be placed upon Boon in an effort to improve the quality of his business, particularly, in regard to persistency. One such restriction was that prospectively none of Boon's applications would be accepted without the payment of a cash premium at the time of the taking of the application. Payment of premium at time of application may be contrasted with "C.O. D." business. (In the insurance industry, "C.O.D." business is the taking of the application with no receipt of premium, the full processing of the application by the insurance company, the insurance of a policy by the company, and delivery of the policy to the soliciting agent. The soliciting agent then "delivers" the policy to the insured, who thus, in effect, has an option of making payment of the premium and accepting the policy or refusing to pay any premium which "cancels" the policy for non-payment of premium).
16) A further restriction was that Boon could not accept applications which required payment of premiums on a monthly or quarterly mode, unless the applicant authorized his bank to make premium payment on the monthly or quarterly basis by preauthorized bank draft. The final restriction was that a persistency rater would accompany each of Boon's applications to the Regional Office. The foregoing restrictions were communicated in writing to Boon by the plaintiff on July 24, 1970.
17) The above restrictions placed upon Boon to improve his persistency were not unlike standard agency procedures and regional practices. A printed manual entitled, "Standard Agency Procedure" which was distributed to the Harber agency prior to the situation concerning Boon indicates similar restrictions to be employed by an agency in general. Section II-H provides the following:
Monthly Premiums
It is the policy of the Agency to accept no monthly premium business unless (a) submitted cash with the application and (b) approved by the General Agent. It is strongly suggested that in lieu of regular monthly premium business that you utilize the facilities of Boatmens Bank for premium financing. In most cases this premium financing is more than competitive with the monthly premium rate on direct monthly remittances to the Home Office.
Also akin to the restrictions placed upon Boon was the policy directed at the Pacific Coast Region on March 2, 1970, by the Regional Agency Director. To ameliorate a below par persistency rating in the Pacific Region it was decided that no future monthly premium business would be accepted. As to the restriction requiring that a persistency rather accompany all of Boon's applications to the Regional Office, such is not burdensome inasmuch as the raters had always been submitted to the General Agent.
18) With the restrictions placed upon Boon and the ensuing apprehension on the part of Agent Nelson because of his similar predicament, the plaintiff decided to investigate employment with another company. On Monday, August 3, 1970, plaintiff called Mr. Richard Strauss, of General American Life Insurance Company, requesting an appointment with him for the purpose of discussing the possibility of becoming a General Agent for General American, a competitor of defendant, and the company which one year previously had rejected Harber as a General Agent on the sole ground that he had not exhibited at least one year's experience in the management of a general agency. The next morning, a meeting was held between plaintiff and a representative of General *683 American to discuss such possible association.
19) Thereafter, plaintiff furnished General American with a formal written employment application dated August 9, 1970, by which he sought to be appointed a General Agent for General American. Plaintiff, then entered into a General Agency Contract with General American Life Insurance Company effective August 15, 1970.
20) By letter of August 17, 1970, plaintiff voluntarily terminated the General Agency Contract with defendant pursuant to the Contract terms at page 11, XIII, TERMINATION, which provides the following:
B. Termination by Notice. This Contract may be terminated with or without cause by either party hereto upon written notice to the other party.
Such termination was also applicable to the Supplements to the General Agent's Contract.
21) Garfield Boon continued as a Producing Agent for the defendant until August 31, 1970, at which time Mr. Boon voluntarily terminated his contract pursuant to a duplicate provision that the plaintiff followed.

Conclusions of Law
This Court has jurisdiction of this action based upon diversity of citizenship. 28 U.S.C. § 1332.
Count I of the amended complaint states a cause of action founded upon the tort theories of either intentional interference with a contractual relationship or the intentional interference with a business relationship. The elements for the intentional interference with a contractual relationship are the following:
(1) the contract;
(2) the defendant's knowledge thereof;
(3) its intentional interference causing its breach;
(4) the absence of justification; and
(5) damages resulting therefrom.[1]
Similarly, the basic elements to establish a prima facie case of interference with a business relationship are the following:
(1) existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy;
(2) knowledge of the relationship or expectancy on the part of the defendant;
(3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy;
(4) the absence of justification; and
(5) and resultant damage to the party whose relationship or expectancy has been disrupted.[2]
An indispensable element of an action for either type of tortious interference is the absence of justification. Herein, even if this Court considers the restrictions placed upon Boon by the defendant as constituting an interference, such is not actionable if justified. Smith v. American Guild of Variety Artists, 349 F.2d 975 (8th Cir., 1965), vacated on other grounds 384 U. S. 30, 86 S.Ct. 1283, 16 L.Ed.2d 332 (1965); Downey v. United Weatherproofing, supra. However, this Court cannot consider the defendant's restrictions on Boon to be either an interference or non-justifiable. Rather, the restrictions were founded upon proper authority and legitimate reasons. As previously mentioned both the General Agent's Contract and the Producing Agent's Contract state that the plaintiff and Boon "shall observe and conform to such rules and regulations as the Company, from time to time shall publish relating to its underwriting practices, the *684 acceptance of risks, and the delivery of policies, or otherwise relating to the general conduct of business."[3] Accordingly, the contractual agreements alone would allow for the restrictions placed upon Boon. Moreover, the "Standard Agency Procedure" manual foretold of the similar restriction of accepting no monthly premium business without a cash remittance. Furthermore, the Pacific Region mandate of the non-acceptance of monthly premium business fuels the argument for justification in this case. Finally, the economic reality that the type of business that Boon solicited would not meet the company standard as to persistency would lend legitimization to the restrictions placed upon him.
This Court cannot find the requisite elements for a viable interference action, in consequence Count I must fail.
Count II of the amended complaint alleges that the defendant materially breached plaintiff's Agency Contract. Specifically, plaintiff avers that the right of plaintiff's Producing Agent, Boon, to submit insurance business on regular monthly and quarterly modes of premium payment, and his right to collect the initial premium upon delivery of the policy as opposed to securing the same at the time of the application, were unilaterally and improperly withdrawn by the defendant.
An initial query confronting this Court is whose rights are being redressed in Count II. It appears from the posture of this lawsuit that the General Agent claims impinged rights, however, with closer scrutiny of Count II it would appear that the rights of the Producing Agent are at issue. From the tenor of plaintiff's theory he would urge the panacea of some genre of a tripartite agreement between the defendant, plaintiff and Boon memorialized by Boon's Producing Agent's Contract. Without attempting to delve into those murky waters with the likely retrieval of some sort of red herring, a proper reconsideration of both the General Agent and Producing Agent's Contracts will destroy the breach action.
Again, Section V of both Harber's General Agent's Contract and Boon's Producing Agent's Contract afford the defendant contractual authority to make rules and regulations concerning "its underwriting practices, the acceptance of risks, and the delivery of policies, or otherwise relating to the general conduct of business". This Court finds that the aforesaid restrictions placed upon Boon were within the agreed upon contractual powers of the defendant and accordingly no breach of contract action lies.
Count III of the amended complaint states an action for misrepresentation based on the allegation that the defendant represented to the plaintiff that his Producing Agents could sell policies which allowed for premium payments on a direct monthly or quarterly basis and thereafter revoked such payment modes as to Producing Agent Boon. However, plaintiff has effectively withdrawn his claim for relief under Count III in his "Reply to Defendant's Proposed Findings of Fact, Conclusions of Law and Brief" filed in this Court on January 14, 1974, with the following statement: ". . . plaintiff did not and does not rely upon Count III for relief." Accordingly, Count III shall not be considered.
NOTES
[1] American Surety Co. v. Schottenbauer, 257 F.2d 6 (8th Cir., 1958); Downey v. United Weatherproofing, 363 Mo. 852, 253 S.W.2d 976 (1953).
[2] 45 Am.Jur.2d, Interference, § 50 at 322 (1969); Downey v. United Weatherproofing, supra.
[3] Notwithstanding plaintiff's argument for a definition of the word "publish" to mean to make generally known or to make known to people in general so as to exclude an oral directive to the plaintiff which was later confirmed by letter and written notice to Boon, this Court would include such directive, subsequent letter and written notice in its construction of the word "publish". To interpret the word "publish" in the context of an insurance agency so as to include people in general and exclude two agents of a three man agency, would be to unjustifiably emasculate the clear meaning of English in its context herein.