496 F.2d 813
 86 L.R.R.M. (BNA) 2185, 86 L.R.R.M. (BNA) 2688,
73 Lab.Cas. P 14,507, 74 Lab.Cas. P 10,146
 FEDERAL PRESCRIPTION SERVICE, INC., and Drivex Co., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Amalgamated
Meat Cutters and Butcher Workmen of North America,
AFL-CIO, et al., Intervenors.
AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH
AMERICA, AFL-CIO, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 73-1362, 73-1420.
 United States Court of Appeals, Eighth Circuit.
 Submitted Jan. 14, 1974.
Decided May 1, 1974
As Modified on Denial of Rehearing and Rehearing En Banc June 6, 1974.
 
 George S. Leonard, Washington, D.C., for petitioners.
 Judith Wilkenfeld, Atty., National Labor Relations Board, Washington, D.C., for respondent.
 Russell Woody, Chicago, Ill., for intervenors.
 Before Van OOSTERHOUT, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 These consolidated appeals are before the court upon the several petitions of Federal Prescription Service, Inc., and Drivex Company (Employer) and Amalgamated Meat Cutters and Butcher Workmen of North America (Union) pursuant to 29 U.S.C. 160, seeking review of an order issued against Employer on May 31, 1973, 203 N.L.R.B. No. 145, and upon the National Labor Relations Board's cross-application to enforce the order.
 
 
 2
 The Board found in agreement with its trial examiner[1] that Employer violated 8(a)(1) of the National Labor Relations Act by coercively interrogating its employees, interfering with employee meetings, threatening its employees with discharge, discriminatorily changing work rules, and promising benefits as an inducement to abandon support of the Union; that Employer violated 8(a)(3) and (1) of the Act by discharging ten employees in order to discourage pro-Union activities; and that it violated 8(a)(5) and (1) of the Act by refusing to bargain with the Union. The Board concluded that Employer's violations 'not only precluded a fair election, but were of such a pervasive and aggravated character . . . that an order directing the Company to bargain with the Union (was) necessary to repair the unlawful effects.' N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 3
 The Board's order directed the Employer to cease and desist from the unfair labor practices found, and from in any other manner interfering with, restraining, or coercing its employees in the exercise of their protected rights guaranteed under 7 of the Act. Additionally it directed Employer to offer the discriminatees full and immediate reinstatement and to make them whole for any loss of pay suffered by reason of the discrimination, and to post customary notices.
 
 
 4
 Federal Prescription Service, Inc., is a national mail order drug prescription business. Drivex Company is also a mail order drug firm and a mailing service operation. Federal Vitamin Service is a national mail order vitamin business directed principally to individuals. The work for each company is conducted by the same group of employees, the companies operate out of a single plant facility located in Madrid, Iowa, and the companies share common ownership. Craig Sandahl is the principal stockholder and president of each company. T. R. Rasmusen is a minor stockholder and officer of both Federal Prescription and Federal Vitamin Service, and Richard Johann is a minor stockholder and officer of all three companies. The Employer's work force is made up primarily of housewives and schoolgirls. Regular employees are paid $1.60 per hour and are given no paid holidays or sick leave.
 
 
 5
 In early March, 1971, a Union organizational campaign commenced at Employer's plant. Upon learning of the attempted organizational effort, Employer attempted to attend unionization meetings, changed working hours and conditions of several Union adherents, declined to recognize the Union without an election when requested by letter to do so, and ultimately discharged several employees prior to the election. This in turn triggered a strike and mass picketing of Employer's operation, and caused a temporary restraining order against mass picketing to be issued by a state court. Thereafter an election was held, the results of which were not certified because of Union objections. These objections were consolidated for hearing with unfair labor practice charges.
 
 
 6
 For the reasons hereinafter stated we grant enforcement of the Board's order in part.
 
 I. 8(a)(1) VIOLATIONS
 
 7
 With respect to the 8(a)(1) violations, we find that there is substantial evidence upon this record as a whole to support the Board's determination. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 8
 On March 3, 1971, an employee petition was circulated and signed by nearly the entire work force demanding higher wages and better working conditions. Upon learning of the petition, Employer's president, Sandahl, called employee Betty Peterson into his office and interrogated her in the presence of other supervisory personnel as to the petition's purpose and the identity of the participants. The record discloses that the nature of the inquiry led to evasive answers on the part of employee Peterson. We have previously held such interrogations to be unlawful. See e.g., N.L.R.B. v. Midwest Hanger Co. & Liberty Eng. Corp., 474 F.2d 1155, 1161 (8th Cir. 1973).
 
 
 9
 Following this incident, Sandahl called an employees meeting to discuss their complaints. Dissatisfied with Sandahl's responses, approximately 35 to 40 employees gathered afterhours on March 5 to discuss contacting a union representative. Sandahl likewise attempted to attend this meeting and suggested that the employees return to the plant and further discuss their complaints.
 
 
 10
 The initial meeting with an international representative of the Union was held on March 9. Again Sandahl made an uninvited appearance, this time with Richard Johann, an officer of Employer Corporation. Sandahl attempted to explain his presence by indicating that he understood he was attending an open meeting, and that the employees' questions would most likely not be answered unless he were present. Sandahl and Johann left at the insistence of the Union representative. After their departure 34 or 35 employees signed cards designating the Union as their collective bargaining representative.
 
 
 11
 In the midst of this organizational activity, several work changes were made with respect to Union adherents. Employee Terry Edwards had her desk moved closer to her supervisor so that her work habits could be more easily observed. Additionally, employees Betty Peterson, Helen McCormick and Peggy Hoover had their working hours changed in order to preclude pro-Union discussion during unsupervised non-regular company hours. Richard Johann testified that he had imposed a so-called 'no-nonsense' rule which forbade employees from leaving their working stations to talk to one another. It appears from the record, however, that an employee anti-Union committee was permitted to function freely during regular working hours.
 
 
 12
 On March 15, employee Steven Hansen, Johann's son-in-law, called a meeting of six employees at which he suggested that Sandahl be given another opportunity to resolve their problems.[2] Sandahl in turn indicated that since They had gone to the Union his hands were tied, but that he felt he could provide the same benefits as fast as an outsider could. These activities were followed by instances where Richard Johann's wife elicited information from employee Diana Hamil with respect to the latter's opinion about and activities concerning the Union, and where Mrs. Johann by implication threatened to fire employees Hoover and Peterson for giving legitimately acquired sales information to another Union company.
 
 
 13
 We find no basis upon which to reject the Board's findings in connection with these 8(a)(1) violations. Its determination in this respect is therefore sustained.
 
 II. 8(a)(3) VIOLATIONS
 
 14
 On April 2, 1971, ten employees were terminated. The following day a strike commenced in protest of the discharges. A petition for a temporary restraining order against Mass picketing was subsequently filed by Employer in state court, and an order granting the same was issued on April 8. Thereafter, on one occasion, mass picketing occurred, principally by husbands of employees and by employees of other plants represented by the Union. On two other occasions later in April, a number of car-following incidents occurred. This ultimately led to two groups of employees being found in contempt of court.
 
 
 15
 On April 20, the parties signed a stipulation for Certification Upon Consent Election. An election was conducted on May 13, at which 23 persons who presented themselves at the polls were challenged. Thereafter, the Union filed timely objections which were consolidated for hearing with the unfair labor practice charges.
 
 
 16
 On May 25, the Union offered by mail to end the strike and requested the immediate unconditional reinstatement of the striking employees. On June 10, Employer recalled some, but not all, of the strikers. None of the strikers responded. On June 16, Employer sent letters to employees Peterson, McCormick and Edwards and informed them that because of their 'serious misconduct in connection with the strike and picketing,' Employer 'cannot consider continuing your employment.'
 
 
 17
 The ten discharges on April 2, 1971, occurred less than two weeks after the Union filed its election petition (filed March 22) but prior to the date on which an eletion could be held. The discharged employees were given no prior notice that Employer was contemplating a reduction in its work force. At the time the Union requested recognition, it had a majority of employees in the bargaining unit,[3] but nine out of ten of the dischargees had signed Union authorization cards. Then subsequent to the election, pursuant to the Union's written request, Employer did not hesitate to recall several of the discharged employees.
 
 
 18
 These discharges must be considered in light of Employer's contention that it followed 'departmental' rather than 'plant-wide' seniority in selecting the dischargees. Employer's own hiring list (Exhibit No. 91) refutes this allegation. It shows that three discharged employees from the promotion department were senior in that department to Charlotte Simons, a known anti-Union employee who assisted management in its campaign. Similarly, two promotion dischargees were senior in that department to Steven Hansen, Johann's son-in-law. . Both Simons and Hansen were retained. The Board found, however, that even if departmental seniority were followed by Employer, the discharges were nonetheless discriminatory. That is, the facts and circumstances surrounding these events render the application of departmental seniority highly suspect. For example, seniority at Federal Prescription was based upon time served in the whole company and took no account of time served in the respective departments. Furthermore, Employer did not utilize seniority in traditional ways. There was no established wage or promotional program, nor were there paid holidays or sick leave based upon length of service. Parenthetically, we note that if plant-wide seniority had been utilized, only three Union adherents would have been discharged. Employer suggests that it had no knowledge of the dischargees' relationship with the Union. We are satisfied that the early attempts made by Sandahl to ascertain the names of those who signed the March 3 petition and management's attendance at Union meetings, coupled with the reporting activities of employee Simons and the supervisory activities of Mrs. Johann were, in the aggregate, sufficient to impute knowledge to Employer.
 
 
 19
 Upon this record the discharge of the ten employees can reasonably be characterized as "inherently destructive' of important employee rights.' Such determination under N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967), would thus allow the Board to find unfair labor practices despite evidence introduced by Employer that his conduct was motivated by business considerations. Accord, N.L.R.B. v. Midwest Hanger Co. & Liberty Eng. Corp., supra, 474 F.2d 1155, 1158 (1973). Even assuming that these discharges may have been partially the result of legitimate business considerations,[4] this record is replete with evidence supporting the Board's determination that the April 2 reduction was motivated by Employer's anti-Union animus.[5] See, McGraw-Edison Company v. N.L.R.B., 419 F.2d 67, 76 (8th Cir. 1969).
 
 
 20
 The question remains, however, whether Employer's refusal to reinstate employees Peterson, Mc.Cormick and Edwards was justified. These three employees during the course of the strike violated the Iowa state court injunction prohibiting certain activities, were found guilty of contempt and were fined. During the strike, all three were involved in car-following incidents, in contravention of the state court's order, during which non-strikers were followed to their homes and verbally intimidated. These followings occurred in light of an atmosphere of other acts of terrorism on the part of Union adherents. With respect to employee Peterson, the administrative law judge found that Employer could properly refuse reinstatement because of a verbal threat she made about the continued safety of a son of a non-striker. The Board disagreed and held that the remark when viewed in the context in which it was made[6] did not justify Employer's refusal of reinstatement. We cannot agree. Not every violation of a court order by striking employees justifies an employer's refusal to reinstate those employees found guilty of contempt. See, N.L.R.B. v. Cambria Clay Prod. Co., 215 F.2d 48, 54 (6th Cir. 1954). Nevertheless, the effect of intimidation, verbal assaults and threats on the part of the three employees all in contravention of the clearly defined court order, manifestly provided a justifiable basis upon which to deny reinstatement. Cf. N.L.R.B. v. Blades Mfgr. Corp., 344 F.2d 998, 1004-1006 (8th Cir. 1965). We therefore hold that the failure to reinstate employees Peterson, McCormick and Edwards was not in violation of 8(a)(3) of the Act.
 
 III. THE 8(a)(5) BARGAINING ORDER
 
 21
 In N.L.R.B. v. Gissel, supra, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court stated that the Board may issue a bargaining order even where the union has never demonstrated majority support where the unfair labor practices are so 'outageous' and 'persuasive' that 'their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.' The Court noted further that where the union at one point had a majority, the Board may appropriately enter an order upon a showing of 'less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process.' 395 U.S. 575, 613-614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547.
 
 
 22
 On March 15, the date on which Employer received the Union's request for recognition, the Union held valid authorization cards signed by 36 employees of the 65 employees in the bargaining unit. The Board not only found that the Union held a clear majority, but determined that Employer's activities were of such a 'pervasive and aggravated character' that a fair election was precluded and a bargaining order was necessary. This record supports that determination. The repeated interference with the employee's protected rights in violation of 8(a)(1), and in particular the discharge of the ten employees in the face of the election justifies the Board's finding that a bargaining order should issue in this instance.[7] See, N.L.R.B. v. Sitton Tank Company, 467 F.2d 1371, 1372 (1972).
 
 IV. ATTORNEYS' FEES AND COSTS
 
 23
 Finally, the Union urges that it should have been awarded legal expenses and costs arising from this litigation. Such remedial matters are within the broad discretion of the Board, see N.L.R.B. v. Gissel, supra, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 (1969). Contrary to the Union's position, see, Tiidee Products, Inc., et al. v. N.L.R.B., 194 N.L.R.B. No. 198 (1972), we cannot say based upon this record that Employer's litigation of issues was so frivolous that the Board abused its discretion by failing to make such an award. See also, International Union of E.R. & M.W., AFL-CIO v. N.L.R.B., 138 U.S.App.D.C. 249, 426 F.2d 1243, 1248, 1253, n. 15 (1970). We therefore sustain the Board's determination in this respect.
 
 
 24
 Subject to modification in connection with employees Peterson, McCormick and Edwards, we grant enforcement of the Board's order, including reinstatement and back pay to any April 28 1971 discharge not given an unconditional offer of reemployment.
 
 
 25
 Van OOSTERHOUT, Senior Circuit Judge (dissenting in part).
 
 
 26
 I concur in Division I of the majority opinion and that part of Division II which holds that the employer's failure to reinstate employees Peterson, McCormick and Edwards was justified and did not constitute a 8(a)(3) violation of the Act.
 
 
 27
 I dissent from that portion of Division II which holds that the termination of ten employees on April 2, 1971, constitutes a violation of 8(a)(3) and from Division III of the majority opinion. I base my dissent on those issues on Board Chairman Miller's dissenting opinion. I agree with Chairman Miller's view that there is no substantial evidence on the record as a whole to support a finding that the employer terminated ten employees for discriminatory reasons rather than for economic reasons.
 
 
 28
 The principal unfair labor charge under which the Board may base its bargaining order was the termination of the ten employees. Many of the 8(a)(1) charges were dismissed by the Board. The 8(a)(1) charges established occurred for the most part before the agreement for the election, and the charges established were not such as would support a finding that the 8(a)(1) violations would prevent a new and fair election. I would deny enforcement of the bargaining order and the order for reinstatement of the ten employees terminated on April 2, 1971.
 
 
 
 [1]
 Affirmed by a 2 to 1 vote (Chairman Miller dissenting)
 
 
 [2]
 Employer contends that Hansen was not a supervisor, and therefore his comments are not attributable to management. We cannot agree. Hansen was Johann's son-in-law, he informed the employees that management had prior knowledge of the meeting, he assumed authority during the in-plant meeting to sever the telephone connection so that the meeting would not be interrupted, and he assumed authority to extend the lunch hour of those in attendance. We therefore sustain the Board's finding that Hansen's comments were attributable to management. See, General Merchantile & Hardware Co. v. N.L.R.B., 461 F.2d 952, 955 (8th Cir. 1972)
 
 
 [3]
 On March 15, the date on which the Union's demand for recognition was perfected, there were 65 employees in the bargaining unit, 36 of whom had signed Union cards
 
 
 [4]
 Employer contended that a declining profit margin motivated the terminations. However, the Board found Employer's reasoning to be pretextual. I.e., that sales had increased by 70% In 1970 and by more than 10% In the first quarter of 1971. Although Employer's profit margin had declined considerably in the first quarter of 1971, it was noted during oral argument and supported by the record (transcript at 994, App. 844) that part of Employer's marketing strategy and method of selling during that period was to entice new customers on a 'half-price' basis, intentionally taking a loss, then develop profits on a renewed order basis
 
 
 [5]
 We note that Chairman Miller in dissenting was persuaded that the Employer terminated ten employees on April 2, 1971, for economic rather than discriminatory reasons
 
 
 [6]
 Peterson in effect said to employee Wisecup while the latter was crossing the picket line that Wisecup's son, who worked at a neighboring meat plant represented by the Union, 'just may have an accident.' The Board indicated that while it did not condone the remark, it was an isolated one made on the first day of the strike at a time when feelings and emotions were at their peak
 
 
 [7]
 See, Arbie Mineral Feed Co. v. N.L.R.B., supra, 438 F.2d 940, 943-944 (1971), in which we noted:
 In this case, not marked by any outrageous employer conduct, we must determine whether, under the Gissel rules, Arbie's conduct exerted 'minimal impact on the election machinery', which would obviate the need for a bargaining order, or tended to 'undermine majority strength and impede the election processes', a circumstance entitling us to uphold the Board's issuance of the bargaining order. To draw the line between these two propositions is extremely difficult particularly upon appellate review conducted in the sterile atmosphere of a printed record. The Gissel decision offers the following guideline:
 'It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of 10(c) of the Act (29 U.S.C. 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. (395 U.S. at 612, n. 32, 89 S.Ct. at 1939).'