FEDERAL PRESCRIPTION SERVICE, INC., Appellant and Cross-Appellee,

v.

AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO AND ITS LOCAL P–1149, et al., Appellees and Cross-Appellants.

Nos. 74–1451, 74–1469.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1975.

Decided Dec. 18, 1975.

Rehearing Denied Jan. 22, 1976.

---

George S. Leonard, Washington, D. C., for appellant and cross-appellee.

Robert H. Nichols, Chicago, Ill., for appellees and cross-appellants.

Before VAN OOSTERHOUT, Senior Circuit Judge, ROSS, Circuit Judge, and TALBOT, SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This case grows out of a prolonged and acrimonious labor dispute. In the court below, the plaintiff Company, Federal Prescription Service, Inc., hereafter Federal, obtained a jury award of $18,841.95, compensatory damages, and $32,500 punitive damages against the defendant Unions, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, hereafter International, and its Local P–1149. The individual defendants joined in the action were acquitted. The lower court, on motion, struck the punitive award, denied Federal its costs, requiring each party to bear its own, and let stand the compensatory award against both union defendants. We vacate the award against the International and otherwise affirm.

The background of this case was set forth in our opinion in *Federal Prescription Service, Inc. v. National Labor Relations Board,* No. 73–1362, and *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. National Labor Relations Board,* No. 73–1420, both published in 496 F.2d 813 (8th Cir. 1974), in 203 N.L.R.B. No. 145 (1973) and in the record now before us.

Federal is an Iowa pharmacy corporation, having a plant in Madrid, Iowa, doing a national mail order drug prescription business. Its work force con-

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

sisted of local housewives and school girls, in addition to licensed pharmacists. Dissatisfied with their wages and working conditions, certain of the employees sought improvement of their situation and, in early March of 1971 a union organizational campaign was commenced at the plant. Federal's response was a program of unlawful obstruction and coercion.

The Board found in agreement with its trial examiner [1] that Employer violated § 8(a)(1) of the National Labor Relations Act by coercively interrogating its employees, interfering with employee meetings, threatening its employees with discharge, discriminatorily changing work rules, and promising benefits as an inducement to abandon support of the Union; that Employer violated § 8(a)(3) and (1) of the Act by discharging ten employees in order to discourage pro-Union activities; and that it violated § 8(a)(5) and (1) of the Act by refusing to bargain with the Union. The Board concluded that Employer's violations "not only precluded a fair election, but were of such a pervasive and aggravated character . . . that an order directing the Company to bargain with the Union [was] necessary to repair the unlawful effects." *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

[1]. Affirmed by a 2 to 1 vote (Chairman Miller dissenting).

*Federal Prescription Service, Inc. v. N. L. R. B.,* 496 F.2d 813, 815 (8th Cir. 1974) (Footnote in original).

We will here consider certain incidents connected with the strike, which incidents were triggered by the discharge of ten employees prior to the election. We described the following sequence of events, in essential part, in our previous opinion, stating therein that:

On April 2, 1971, ten employees were terminated. The following day a strike commenced in protest of the discharges. A petition for a temporary restraining order against Mass [sic] picketing was subsequently filed by Employer in state court, and an order granting the same was issued on April 8. Thereafter, on one occasion, mass picketing occurred, principally by husbands of employees and by employees of other plants represented by the Union. On two other occasions later in April, a number of car-following incidents occurred. This ultimately led to two groups of employees being found in contempt of court.

496 F.2d at 817.

The record before us is replete with acts of violence and intimidation, well warranting our prior conclusion that there was an atmosphere of terrorism on the part of Union adherents.

The action before us was framed in two counts, the first invoking federal jurisdiction under 29 U.S.C. § 187 (§ 303 of the Labor Management Relations Act), alleging Union violations of the prohibition against secondary boycotts, 29 U.S.C. § 158(b)(4) [1] (§ 8(b)(4) of the

1. (b) It shall be an unfair labor practice for a labor organization or its agents—

&ast; &ast; &ast; &ast; &ast;

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor

Act), the second filed under the pendent jurisdiction of the District Court, alleging claims for compensatory and punitive damages under Iowa tort law for injury to Federal's business and property.

Federal here appeals the trial court's setting aside of the jury award of punitive damages, of its denial of costs to Federal, and of its exclusion of Federal's evidence relating to its loss of future profits. The Unions have cross appealed, alleging error in the Court's denial of their motions for directed verdicts and for judgments n. o. v., error in the Court's submission of the second count to the jury after dismissal of the federal cause of action asserted in the first count, and in denial of their motion for remittitur of the award of compensatory damages.

We first consider the District Court's dismissal of count one, the federal cause of action, together with its retention of the case thereafter under its pendent jurisdiction. The charges of secondary boycott made in count one related to plaintiff's allegations of violations of Section 8(b)(4), 29 U.S.C. § 158(b)(4), with respect to the Madrid Sanitary Service and the Bud Plummer Construction Co., contractors hired by Federal to pick up its trash.

The District Court held that the evidence tendered in support of the secondary boycott charge as to these entities was "so devoid of merit as to both the elements of damage and liability that it warranted a directed verdict," and, further, that the secondary boycott count "lacked substance and was filed merely to give the Court jurisdiction over the pendent count."[2]

organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:
*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purpose of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit

publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

2. The trial court summarized the factual situation with respect to the performance of service by the two companies involved in the following terms:

Now, taking into consideration what has been urged upon this Court as it relates to the evidence in this case, and what the Court considers to be the evidence in this case, actually there is no substantial evidence of activity by the Disposal Company except to the removal of, I think it's the removal of waste from this small company, and this service seems to be, seems to have been only slightly interrupted, if interrupted at all. In any event, there is positively very little—this Court cannot find any real actual damage proven as flowing therefrom. As to the Plummer Construction Company, the evidence is that the company is a little one-man affair doing odd jobs of cement and brick work. Actually, this one-man construction company took over the matter of

The objective of the Union action was to place direct economic pressure on Federal in order to accede to the Union's demands which had their origins in the working conditions and pay schedules in Federal's plant. Such a strike in support of lawful demands is, of course, permissible. Its restrictive impact, should such occur, upon suppliers and contractors is predictable and not unlawful.

In *National Maritime Union v. N.L.R.B.*, 367 F.2d 171 (8th Cir. 1966) we pointed out, quoting *United Steel Workers of America, AFL–CIO v. N.L.R.B.*, 376 U.S. 492, 499, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964) that:

> The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved "primary picketing" from the secondary ban.

367 F.2d at 176.

■ Plaintiff stresses to us that the defendants threatened and coerced certain persons, including the trash contractors here involved. It is clear, however, that where the picketing is primary, as it was here, it does not become illegal secondary activity because it was accompanied by threats and violence. *United Steel Workers of America, AFL–CIO v. N.L.R.B.*, 376 U.S. 492, 501, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), *Smith v. American Guild of Variety Artists*, 349 F.2d 975, 978 (8th Cir. 1965). There was no error in the dismissal of this count.

■ The federal count having properly been dismissed, the question of pendent jurisdiction over count two, the Iowa tort claim, arises. The defendants urge that "once having concluded that the federal count was totally baseless

and assuming, *arguendo*, that the court was correct in declining to enter a judgment in favor of Defendant Unions . . . the court abused its discretion by submitting the common law tort claims contained within the pendent count to the jury." This issue will not detain us long. The pleadings embodied a secondary boycott claim of apparent substance combined with a state tort action, both deriving from a common nucleus of operative fact. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although the evidence did not warrant a finding for Federal on the issue of secondary boycott, we are of the opinion that, given the expenditure of judicial time and energy on this case, and in view of the common nucleus of operative fact, the exercise of pendent jurisdiction by the District Court was not an abuse of its discretion. *Id.* at 725–726, 86 S.Ct. 1130; *Kayser-Roth Corp. v. Textile Workers Union of America*, 479 F.2d 524 (6th Cir. 1973). Professor Moore accurately summarizes the present state of the law in the statement that:

> [T]he standard to be applied under *Gibbs* is essentially one of convenience not too different from that established for joinder of claims under Rule 18. And the trend, confirmed by *Gibbs*, away from a rigid jurisdictional theory toward a matter of convenience and sound judicial administration has accelerated since the Court's decision of *Gibbs*.

3A J. Moore, Federal Practice, § 1807[1.–4] at 1953 (1974). (Footnote omitted.)

This court, in *Farmland Industries, Inc. v. Kansas-Nebraska Natural Gas Co., Inc.*, 486 F.2d 315 (1973) has made clear that pendent jurisdiction is a doctrine not of plaintiff's right but of the court's discretion.[3]

---

the disposal problem . . . and carried it out for a short time and seemed to have done so without much problem or trouble. As a matter of fact, he wouldn't even permit any trouble, as I understand it. So the Court cannot see any damages in that matter.

3. On this appeal, Farmland has suggested that the district court should have exercised pendent jurisdiction over the claim for damages arising from excessive rates charged for gas. This contention raises no claim of reversible error here. As has been noted by the Supreme Court, " * * * pendent jur-

■ With respect to the damages assessed in the pendent count retained, it is argued to us that as to the International Union in particular there is a complete failure of the proofs demanded by Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106.[4] The requirements of Section 6 are clear, namely that Federal must establish by "clear proof" that the International, through individual officers, members, or agents participated in, authorized or ratified the unlawful acts complained of.

It is settled that Section 6 applies to federal court adjudications of state tort claims arising out of labor disputes "whether or not they are associated with claims under § 303[5] to which the section does not apply." *United Mine Workers of America v. Gibbs, supra* 383 U.S. at 737, 86 S.Ct. at 1144 (Footnote ours; footnote in original deleted).

The meaning of the term "clear proof" found in § 6 was examined by the Supreme Court in *Gibbs* as to which it was said:

Although the statute does not define "clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof." Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a sub-

stantial margin, to come forward with "more than a bare preponderance of the evidence to prevail." *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796. 383 U.S. at 737, 86 S.Ct. at 1145.

■ The "clear proof" standard above referred to applies only to proof of authorization, participation, or ratification, that is, as sometimes put, "only to the issue of union responsibility." *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 450 F.2d 271, 273 (2nd Cir. 1971), citing *Ramsey v. United Mine Workers*, 401 U.S. 302, 307–11, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). It does not change the standard of proof for other issues. Going, then, to the matters of "participation, authorization, or ratification," and to the relationship between the International and the Local Union in this case, the situation was described on the record by Mr. David W. Hart, at that time Vice President of Amalgamated Meat Cutters, and Director in charge of Iowa, South Dakota, and Nebraska. It was his testimony that he did not supervise the Local. The Locals, he stated, were autonomous. "They operate by themselves, and only come to us for advice."

Mr. Hart was present at the Madrid strike headquarters one time only and at that time he walked the picket line with other strikers. International Representatives Ben Dettweiler, now deceased, Harry Hendrix and James Robinson were also present at various times during the strike. During the progress of this lengthy strike there was, it is clear,

isdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). But, in saying this, we do not mean to intimate that the district court might not have exercised pendent jurisdiction over the rate phase of the controversy between the parties if it had so chosen.

486 F.2d at 318 n. 1.

4. 29 U.S.C. § 106:

Responsibility of officers and members of associations or their organizations for un-

lawful acts of individual officers, members, and agents

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

5. Section 303 of the Labor Management Relations Act, as amended, 29 U.S.C. § 187.

reprehensible conduct on the part of some of the Union adherents. There was name calling, threats, car following, and property damage, as noted in our previous opinion and herein. The aid of the state courts was sought, injunctive relief obtained and on two occasions named defendants and the Local itself were found in contempt, the first for "a clear and palpable violation of the prohibition against mass picketing and against congregating in large groups at the premises." [6] Subsequent to this finding, sentencing was deferred for a period of six months subject to the good behavior of the defendants. The other violation related to car-following incidents on May 19 and May 20, for which the various defendants, namely the Local Union and individuals, were fined in sums ranging from $200 against the Union, and $100 against President Gettler and member McCoy, down to $25 for four other named individuals.

So far as clear proof of participation in, authorization of, or ratification by any International officer or representative in any unlawful or violent conduct is concerned, we are cited to no incident to which such requirements are applicable and our individual review of the record discloses none. Hart, the International Vice President, as we have noted, walked the picket line on one occasion. Messrs. Dettweiler and Hendrix, International Representatives participated in the organizing activities leading to the National Labor Board election on May 13. Plaintiff's witness, Bernice Plummer, whose trailer was the object of a possible arson attempt, testified that Mr. Hendrix "and several ladies" called on her one time, promoting the Union point of view, but their attitude was friendly. The International's representatives were present on various days during the strike, and attended the contempt hearings, but we find it significant that although record is replete with identification of Union adherents whose acts were the subject of charges made, a not unusual situation, since, as the State Judge put it, "Madrid is a small town," [7] there was no such identification of any of the International Representatives, nor were charges made against them. The plaintiff urges to us that "the fines of the convicted strikers were paid by the Union" (apparently meaning the International) but the record does not sustain the positive assertion made. The "Order and Judgment" of the state court, Exhibit 2, sentencing for both contempts, names only the Local as defendant in each case. The Local's President, Mr. Gettler, when asked with respect to Exhibit 2 "Was the fine paid by the Union" responded that it was. We are unable to gather from this that it was, as plaintiff asserts, the International, rather than the convicted Local, which paid the fine.

Also, with respect to the International, plaintiff stresses to us that "strike benefits were paid by the International to convicted strikers," and that "violations were reported weekly to the International." This latter reference is to the Union's "Strike Status Report," apparently a routine report submitted weekly [8] referring in general terms to

---

**6.** Prefatory to the finding the court described the surrounding circumstances in the following terms:

> On the morning of April 21, 1971, as if by design of someone, spikes and nails were found in the driveways of many of the nonstriking employees. Later that day shortly before 4:30 quitting time at the plant premise, the 15 individuals named in the application were at the plant premise near the principal Main Street and Second Street entrances to the plant and scattered between the two entrances. Most of them carried signs, were milling about and hollering at exiting employees, calling them "scabs" and thumbing their noses at them.

**7.** Findings of Fact, Conclusions of Law, and Order, District Court of the State of Iowa in and for the County of Boone, filed June 1, 1971.

**8.** Testimony of Mr. Hart:

> Q. And did they (the International's representatives) give you a report?
> A. Yes.
> Q. How often?
> A. Well, they sent in a report to the International every week with a copy to the district office and in that copy of that report they gave their activities for the week, wherever it might have been.

the progress of the strike. Strike benefits were also paid as a matter of routine procedure where the strike is properly authorized.[9]

The plaintiff's argument at this point obviously goes to ratification, but what was involved was no more than the progress of normal union functions during a strike period. Such does not amount to ratification.

> The remaining issue is whether there was clear proof that the union ratified the violence which had occurred. Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on some normal union functions, such as provision of strike relief. A union would ordinarily undertake these tasks during the course of a lawful strike.

*U.M.W. v. Gibbs, supra*, 383 U.S. at 738–739, 86 S.Ct. at 1145.

We have examined with care the entire transcript of evidence offered in this case and it is our conclusion that as to the International the record lacks the "clear, unequivocal and convincing proof" required by the stringent standards of the Norris-LaGuardia Act. The nexus connecting the acts complained of to the International, in the degree required by § 6, has not been shown. The same cannot be said of the Local. Its conduct meets the "clear proof" standard required.

Defendants' motion to set aside the award of punitive damages was granted and the judgment entered ordered to be modified accordingly. The court cited a number of reasons in support of the ruling, none of which, save one, do we reach, since we consider dispositive thereof that "an award of punitive damages of the size granted in this case, given the nature of the cause of action and the evidence submitted offends this Court's sense of justice."

█ Under Iowa law, punitive damages may be awarded where an act is "done in such manner and under such circumstances as to show heedlessness and an utter disregard and abandonment as to what result may flow from the doing of an act or from the manner in which it is done." [10] In Iowa, as is commonly held elsewhere, the award of punitive damages, under proper instruction, is within the sound discretion of the jury. Such discretion, however, is not unlimited or unbridled. Should the award be so gross, under the circumstances, as to exceed the bounds of reason it is subject to revision or control on the part of the trial judge. As we held in *Bankers Life and Casualty Company v. Kirtley*, 307 F.2d 418, 424 (8th Cir. 1962):

> We agree with Judge Stephenson's view that no hard and fast rule has been formulated by the Iowa court for measuring a verdict for exemplary damages for excessiveness. The cases in Iowa and generally appear to indicate that because of the nature of the problem presented, no precise standard can be laid down. We believe that Judge Stephenson properly summarizes the applicable Iowa law in his opinion, as follows:
>
>> "The Iowa Court has stated many times that the assessment of exemplary damages is peculiarly within the discretion of the jury. E. g.

---

One report, that for the week ending May 10, 1971, in response to form question No. 9: "Have there been any arrests of our membership or any violations since the strike started?" stated "Yes. Court injunction, decision still pending."

9. Testimony of Mr. Hart:
   Under the Amalgamated Constitution, when the local union goes on strike it has to get the permission from the International Union to draw strike benefits and get help from the International Union.

10. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 859 (Iowa 1973).

*Gregory v. Sorenson,* 1932, 214 Iowa 1374, 242 N.W. 91; *Brause v. Brause,* 1920, 190 Iowa 329, 177 N.W. 65. However, this discretion is not unlimited. In deciding whether the verdict was so excessive as to show passion and prejudice on the part of the jury, the Iowa Court has stated, 'The test is, not what amount the court would have allowed, but whether the verdict is so large or small, as the case may be, as to shock the conscience.' *Brause v. Brause,* supra, 190 Iowa at page 337, 177 N.W. at page 68. This test of 'conscionableness' has been most recently reiterated in *Sergeant v. Watson Bros. Transp.,* supra, 244 Iowa [185] at page 199, 52 N.W.2d [86] at page 94." 198 F.Supp. 35.

\*   \*   \*   \*   \*   \*

The Iowa cases heretofore cited and those discussed in the A.L.R. Annotations reflect that courts have frequently reversed exemplary damage awards when they found the result to be shocking or to constitute a miscarriage of justice, although it is recognized that a large degree of discretion is vested in the jury in determining the amount of exemplary damages and that the verdict and the trial court's denial of a motion for new trial should be upset only in exceptional situations.

▇▇▇ Upon review we agree with the trial judge that this is the exceptional situation warranting reversal of the jury award of exemplary damages. We are aware from the record before us, as was the trial judge, of the bitterness and the passions of this labor controversy,[11] and of its "triggering"[12] by the unlawful conduct of the plaintiff, a circumstance bearing upon provocation as well as mitigation.[13] Significant also are the relatively modest fines imposed by the state court for substantially the same conduct as that serving as a basis for the punitive award. Although, under Iowa law, the award of punitive damages will not be prevented by a prior criminal conviction for the same act, *Amos v. Prom,* 115 F.Supp. 127, 134 (N.D.Iowa 1953), and cases there cited, this is not to say that the quality of the state's criminal sanction has no bearing in the court's consideration of the surrounding circumstances.[14] In a roughly parallel situation, involving mutual fault in a lengthy strike in Tennessee, violence, and the interposition of the State's injunctive and remedial process, it was the ultimate conclusion of Chief Judge Frank Wilson, the trial judge, that:

> In view of the fact that the plaintiff has itself heretofore been found guilty of unfair labor practices precipitating the strike, in view of the compensatory damages awarded, and in view of all of the circumstances shown in the evidence, the Court is of the opinion that no award of punitive damages should be made herein.[15]

As we held in *National Food Stores, Inc. v. Utley,* 303 F.2d 284 (8th Cir. 1962):

> The duty and responsibility of keeping damages within reasonable bounds must, however, in the interest of or-

**11.** For a discussion of the award of punitive damages in a labor controversy, *see International Union, UAW–CIO v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958). Brandwen, *Punitive-Exemplary Damages in Labor Relations Litigation,* 29 U.Chi.L.Rev. 460 (1962); Smoot, *"Staggering Punitive Damages" Against Labor Unions,* 7 Clev.-Mar.L. Rev. 524 (1958).

**12.** *Federal Prescription Service, Inc. v. N.L. R.B.,* 496 F.2d 813, 815 (8th Cir. 1974).

**13.** *Gronan v. Kukkuck,* 59 Iowa 18, 12 N.W. 748 (1882). "[P]rovocation should be considered by the trier of fact in determining the allowance and amount of punitive damages. Restatement of Torts, § 921 at 622.

**14.** "The awarding of punitive damages is not prevented by a prior criminal conviction for the same act, which is relevant only to the amount of the awards \* \* \*." *Comment,* Restatement of Torts, § 908 at 554.

**15.** *Kayser-Roth Corp. v. Textile Workers Union of America,* 347 F.Supp. 801, 815 (E.D. Tenn.1972), *aff'd* 479 F.2d 524 (6th Cir.), *cert. denied* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). (Citation omitted.)

derly administration of justice, remain primarily with the trial judge.

303 F.2d at 287. (Citation omitted.)

Here the trial judge gave careful consideration to the acts of violence involved, their timing, their duration, their gravity, their setting, and to the "nature of the cause of action." In the light of such and related considerations it was his conclusion that the punitive award should be set aside. We agree.

With respect to compensatory damages claimed, allegedly arising out of acts of violence and intimidation, the arguments made to us, as in the trial court, largely revolve around the issues of causation. Thus it is disputed whether additional freight and cartage costs were incurred by reason of the drivers' intimidation as a result of their being "chased around town and * * * [efforts made] to intercept them" or because of the drivers' refusal to cross the picket line; whether the retention of the Pinkerton guards during the picketing was reasonably required for the safety of the plant; and whether the business loss suffered by plaintiff by reason of the absence of employees was due to their fear induced by coercive acts and intimidation, or because, as plaintiff argues "they were asked not to work" by relatives who were either members of the Local, of other labor organizations or were related to other strikers.

With respect to these and other matters generally related to causation the Iowa court has held:

> [W]e are firmly committed to the rule that plaintiff's theory of causation need not be proved by evidence so clear as to exclude every other possible theory. The evidence must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence.[16]

■ We believe it would serve no useful purpose to prolong this opinion with additional discussion of the details of the evidence tendered. We are met at every turn, as was the jury, and as indicated above, by conflicts as to acts and motivations. Responsibility for resolving doubtful issues of fact rests upon the jury. Questions of credibility and weight are for them, not us, and their determinations cannot be upset if they are supported by substantial evidence. *L. & W. Construction Company v. Kinser,* 251 Iowa 56, 99 N.W.2d 276 (1959). *Wiley v. United Fire & Casualty Company,* 220 N.W.2d 635 (Iowa 1974).

After an extensive review of the record we share the opinion of the trial court that although the plaintiff's case was "weak as it relates to proof of liability" there was, nevertheless, "sufficient evidence to support the verdict on the jury viewing the evidence in the light most favorable to plaintiff," the award was within in fact slightly under, the range of the evidence and we are satisfied that we should not disturb it.

■ The plaintiff also alleges error in the trial court's refusal to submit a claim of "lost profits" in the amount of $231,000 to the jury. Such are the profits it asserts it would have made, assuming that it had placed advertisements in the house organs of the American Legion, the AAA Iowa Motor Club and the American Farm Bureau Federation, assuming that the advertisements would have generated an estimated amount of business, and further assuming that the estimated profits thereon would have amounted to the figure claimed. These profits were lost, it was asserted, because of lack of personnel to take on the new business "arising from Union activities." The loss figures claimed were stated by plaintiff's expert in response to a question asking him:

> [T]o assume as a basis for his calculations the loss of business, the turndown of business of three associations, and what the hypothetical results would have been.

To the claim of plaintiff's counsel that "we have sworn testimony in the record

---

16. *Bokhoven v. Hull,* 247 Iowa 604, 75 N.W.2d 225, 227 (1956) (Citations omitted).

at the present time that in each of these three cases Federal could have taken on the business, had the business available to it, and had to turn down because of inability to handle it," the court replied "I have failed to hear that testimony, Mr. Leonard, and under any circumstances it's purely speculative under all circumstances here in this case."

■ Even were we to assume, as did the trial court, that the expert's calculations as to future profits were valid, the plaintiff failed to link the alleged loss of future profits to illegal conduct by the defendant. The evidence was admitted on condition that it be connected up, that the plaintiff show that but for the Union's illegal acts, the organizations named would have become customers of Federal. This it did not do. The loss claimed must not only be the proximate result of the defendant's wrongdoing but it must not be speculative or conjectural. *Stockdale v. Agrico Chemical Company, Division of Continental Oil Co.*, 340 F.Supp. 244 (N.D.Iowa 1972). The plaintiff's evidence does not satisfy either requirement.

■ Finally, plaintiff urges error in the court's refusal to award it, as the prevailing party below, its costs. Under Rule 54(d), Federal Rules of Civil Procedure, it is provided that:

> [C]osts shall be allowed as of course to the prevailing party unless the court otherwise directs . . ..

Fed.R.Civ.P. 54(d).

Here the court did otherwise direct, requiring that each party bear its own costs, in view of the fact that:

> [T]his Court finds that the secondary boycott count upon which the pendent count was attached lacked substance and was filed mainly to give this Court jurisdiction over the pendent count.

The action taken was clearly within the court's discretion upon the facts found and we find no abuse thereof. *Environmental Defense Fund, Inc. v. Callaway*, 497 F.2d 1340, 1342 (8th Cir. 1974).

We have carefully considered remaining claims of error and find no merit therein. The judgment is vacated with respect to the International and the case is remanded for further proceedings in accordance with this opinion.