Jack W. GILLESPIE et al., Plaintiffs,

v.

NATIONAL FIDELITY LIFE INSURANCE COMPANY et al., Defendants.

No. 76 CV 713-W-1.

United States District Court, W. D. Missouri, W. D.

May 5, 1980.

Jerome F. X. Waterman, Houlehan & Waterman, Kansas City, William D. Marshall, Jr., Memphis, Tenn., for plaintiffs.

Robert J. Campbell, Brown Koralchik, Fingersh & Sildon, Robert A. Babcock, Margolin & Kirwan, Kansas City, Mo., Tom F. Phillips, Taylor Porter Brooks & Phillips, Baton Rouge, La., for defendants.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, Chief Judge.

### I.

Pursuant to an agreement of counsel filed December 13, 1978, this case was submitted to the Court on a stipulated record for a decision on the issue of liability alone. The Court now makes its findings of fact and states its conclusions of law on the agreed issue. For the reasons stated, the Clerk of the Court will be directed to enter judgment for defendants. Motions for summary judgment earlier filed by defendants will be denied as moot.

### II.

#### Findings of Fact

1. This is an action for breach of contract and civil conspiracy. The Court has jurisdiction over the parties by reason of diversity of citizenship and the requisite amount in controversy, and venue is proper.

2. Plaintiff Executive Group Administration Corporation (EGAC) is a Tennessee corporation with its principal office and place of business in Memphis, Tennessee and is thereby a citizen of the State of Tennessee.

3. Plaintiff Jack W. Gillespie, d/b/a Executive Underwriters (Gillespie) is a Colorado resident with his principal place of business in Denver, Colorado and is thereby a citizen of the State of Colorado. Gillespie is the president and principal shareholder of EGAC.

4. Defendant National Fidelity Life Insurance Company (NFL) is a Missouri corporation with its principal office and place of business in Kansas City, Missouri and is thereby a citizen of the State of Missouri.

5. Defendant SFO Life Consultants, Inc. (SFO) is a Missouri corporation with its principal office and place of business in Kansas City, Missouri and is thereby a citizen of the State of Missouri.

6. Defendant Charles C. Lamb (Lamb) is domiciled in Louisiana and resides in the

City of Baton Rouge, Parish of East Baton Rouge, in said state and is thereby a citizen of the State of Louisiana.

7. NFL is an insurance corporation authorized to engage in the business of life insurance in all jurisdictions in the United States except the State of New York.

8. EGAC was a general agent of NFL under written contract dated July 1, 1974. From May 1, 1970, to July 1, 1974, Gillespie had a general agency contract with NFL. As of July 1, 1974, all previous business done under Gillespie's name in the Memphis office was assigned to EGAC. NFL terminated its general agency contract with EGAC by letter dated December 15, 1976, effective January 15, 1977.

9. SFO is a general agent of NFL under written contract in full force and effect during the period from August, 1976 to date.

10. Lamb is an independent insurance broker licensed in the State of Louisiana during the period from April through December, 1976. During this period Lamb was also an agent of The Mutual Life Insurance Company of New York ("MONY").

11. Wayne E. (Gene) Wolfe (Wolfe) is an independent insurance broker licensed in the State of Louisiana during the period from August through December, 1976. During this period Wolfe was also an agent for Lincoln National Life Insurance Company. Neither Lamb nor Wolfe was ever an employee of SFO, NFL, EGAC or Gillespie.

12. Lamb sold several life insurance policies to Carter Chambers, Jr. (Chambers) between the years 1964 and 1973, all of which remain in force and effect and had been a personal friend and business acquaintance of Chambers for more than fifteen years.

13. In January of 1974, Wolfe placed a policy of insurance in the amount of $150,000.00 issued by NFL on the life of Chambers through Gillespie as the general agent. This policy remains in full force and effect and Wolfe and EGAC are currently earning the commissions thereon.

14. On May 23 and 27, 1975 Lamb called NFL concerning the placement of additional life insurance on Chambers. NFL advised Lamb that since there was already an NFL policy in the amount of $150,000.00 on Chambers with EGAC as the general agent and that NFL had a policy of dealing only through general agents, he should contact George Williams, an officer of EGAC in Memphis, Tennessee. These two telephone conversations were the only contacts that Lamb ever had directly with NFL. Subsequently, NFL informed EGAC of its conversation with Lamb.

15. In early 1976 Chambers (who because of a heart problem had been classified as a substandard risk) called in two insurance brokers, Wolfe and Lamb, on separate occasions and advised them of his desire for additional life insurance coverage.

16. Lamb did not know that he was competing with another broker, but Chambers told Wolfe of Lamb's competition and that because of his long friendship with Lamb, he was "tilting" toward Lamb.

17. On April 13, 1976 Lamb secured Chambers' signature on a trial application for coverage in the North American Life and Casualty Company (NALAC), a wholly owned subsidiary of MONY, to obtain rate information on a proposed $600,000.00 life insurance coverage on Chambers.

18. Initially Lamb was attempting to insure Chambers through NALAC, while Wolfe was working through NFL with plaintiffs as the general agent.

19. On or about July 20, 1976 Dr. James R. Calvin, a cardiologist practicing with Dr. Henry Harvey, Chambers' personal physician, examined Chambers as requested by Lamb. Chambers arranged for his own medical examination which involved an EKG and a treadmill test. Dr. Calvin completed an attending physician's statement.

20. On August 11, 1976, Dr. J. C. Stovall examined Chambers for NALAC. Lamb arranged for this medical examination and personally transported Chambers to Dr. Stovall's office. Without Lamb's knowledge, Chambers had agreed to allow Wolfe

to use the Stovall examination for Wolfe's application to NFL rather than have him (Chambers) submit to a separate physical. Accordingly, on August 18, 1978 Dr. Stovall filled out a medical examination report for submission to NFL based on his August 11, 1976 examination of Chambers, which report was forwarded to EGAC for inclusion with the NFL application.

21. During August of 1976 Lamb and Wolfe submitted applications for $600,-000.00 of life insurance on Chambers to NALAC and NFL, respectively.

22. On September 15, 1976 NFL issued five group life insurance certificates totalling $600,000.00 on Chambers' life and delivered them through Gillespie to Wolfe for placement.

23. NALAC was unable to provide coverage on Chambers at a satisfactory premium rate because NFL had already tied up the key reinsurers. This alerted Lamb for the first time that he had competition for Chambers' business.

24. At NALAC's suggestion, Lamb contacted an SFO representative in Louisiana for aid in applying to NFL for policies on Chambers.

25. On September 15, 1976 Chambers executed a letter designating Lamb as the writing agent and SFO as the general agent. On the same day Lamb submitted a completed NFL application to SFO for $600,000.00 on life insurance coverage on Chambers. SFO forwarded these papers to NFL on October 1, 1976.

26. By September 15, 1976 Chambers had decided to give his business to Lamb.

27. A Letter of Authority or Agent of Record letter, as it is sometimes called, is the vehicle by which a policyholder or prospective policyholder reveals his choice of agents with whom he wishes to do business. In paragraph 8.9 of NFL's Commission Rules, the requirements for a proper letter of authority are set out as follows:

A letter must be currently dated.

The letter must mention specific policies and transactions by company name and policy number.

The letter must be addressed to National Fidelity Life Insurance Company.

The letter must designate a specific broker.

The letter must designate a specific general agent.

Authentic signature(s) must be included by or for the policyowner.

The Company reserves the right to request that the letter of authority be witnessed or notarized.*

28. During the latter part of September and the first part of October, 1976 (a period of nearly a month) Wolfe made repeated attempts to contact Chambers to deliver the NFL certificates then in his possession to Chambers and collect the required premium without success. Chambers told Lamb that Wolfe already had the NFL certificates in his possession and that Lamb's time for producing comparable coverage was running short.

29. By letter of October 7, 1976, NFL rejected Chambers' September 15, 1976 letter of authority and outlined its requirements for an acceptable letter. By courtesy letter of October 8, 1976, NFL informed EGAC of the receipt of the September 15, 1976 letter of authority and the action it took with respect thereto.

30. Before NFL recalled its certificates that were in Wolfe's possession, Wolfe typed up a letter of authority for Chambers' signature, at the suggestion of EGAC. Chambers did not execute it.

31. On October 14, 1976, at Lamb's request, Chambers executed a new letter of authority directed to NFL. Chambers also gave Lamb his check for $2,581.80 representing ten percent of the first year's premium on the NFL policies he was purchasing through Lamb. This letter was accepted by NFL because it satisfied the requirements of paragraph 8.9 of NFL's Commission Rules.

---

* The text of paragraph 8.9 was incorporated in Standard Pretrial Order No. 2, filed July 13, 1979 under "facts, although not admitted, [which] are not to be contested at the trial by evidence to the contrary."

32. Accordingly, after accepting Chambers' second letter of authority, NFL wrote to EGAC on October 22, 1976 and requested a return of the Chambers' policies it had issued to it more than a month before.

33. At least by the time NFL requested that EGAC return the Chambers policies in Wolfe's hands (October 22, 1976), Wolfe no longer had any chance to deliver these policies to Chambers regardless of how much additional time NFL would have given him to do so.

34. NFL finally issued policies on the SFO-Lamb submission on November 12, 1976, by which time SFO had already placed the business with another company at a lower rate. Accordingly, NFL refunded Chambers' premium deposit and cancelled his policies with it.

35. Up to the time of his deposition Chambers had never had any contact with anyone from NFL or SFO. Neither executed any influence on him to use Lamb rather than Wolfe as his agent.

36. At no time did EGAC gain the exclusive right to be the general agent for any NFL life insurance policies placed with Chambers. In the words of its writing broker, Wayne Wolfe, "that's just not the life insurance business."

37. EGAC had no interest in protecting Wolfe's position as the writing agent. Rather, it was primarily interested in convincing NFL to force Lamb to deal through it as the general agent.

38. EGAC never had an exclusive territorial arrangement with NFL such that writing brokers in a particular locale were forced to select it as general agent in order to sell NFL policies.

39. At NFL, commissions on the sale of life insurance policies are payable only from premiums collected and deposited with the company. Since no premium was collected by Wolfe or EGAC, no commission was due either of them on the Chambers submission.

### III.

*Conclusions of Law*

■ 1. There is no contract implied in law between NFL and plaintiffs on which plaintiffs can recover commissions on the sale of life insurance.

■ 2. Plaintiffs' claim to a commission on the sale of NFL life insurance policies on the life of Carter Chambers must fail because Chambers did not purchase any NFL policies or pay NFL any premiums out of which a commission could be paid.

■ 3. There was no breach of the written contract between NFL and plaintiffs. NFL's actions were in accordance with paragraph 8.9 of its Commission Rules which were incorporated in the written contract by section IV-2 thereof.

■ 4. Plaintiffs have failed to establish against any combination of defendants a prima facie case of conspiracy to interfere with a business relationship. *See Harber v. Ohio National Life Ins. Co.*, 390 F.Supp. 678 (E.D.Mo.1974). Plaintiffs have proved neither (a) intentional interference inducing a breach of the business relationship nor (b) the absence of justification, as the cited case requires.

Accordingly, it is

ORDERED (1) that the Clerk of the Court should be and hereby is directed to enter judgment for defendants. And it is

ORDERED (2) that the costs of this action be assessed against plaintiffs and in favor of defendants. And it is

ORDERED (3) that the outstanding motions for summary judgment filed by defendants on September 7, 1978 should be and hereby are denied as moot.